INTERSTATE COMMERCE COMMISSION *v.* ATCHISON, T. & S. F. R. Co. *et al.*

(*Circuit Court, S. D. California.* April 25, 1892.)

1. INTERSTATE COMMERCE ACT—LONG AND SHORT HAULS—COMMISSION.
   To render lawful a greater charge for a shorter than for a longer haul, under section 4 of the interstate commerce act, (24 St. p. 379,) it is not necessary to first obtain authority from the commission. Such charge is lawful if the circumstances and conditions are not in fact "substantially similar," and the carrier may determine the question for himself, subject to a liability for violating the act, if, on investigation, the fact be found against him.

2. SAME—PROCEEDING TO ENFORCE ORDERS OF COMMISSION.
   On a proceeding in the circuit court, under section 16, to enforce an order of the commissioners directing certain carriers to desist from charging a greater rate for a shorter than for a longer haul, the facts found by the commission are not conclusive, but are merely *prima facie* evidence, subject to be overcome by other evidence produced before the court.

3. SAME—COMPETITIVE POINTS.
   Los Angeles, Cal., is a point to which there is active competition in certain kinds of freight, between several transcontinental railway lines, direct, or by water, via Vancouver and San Francisco, also by ocean freights, via Aspinwall and the straits of Magellan, from points east of the Missouri river; and a through rate on the same kind of freight, lower than that to San Bernardino, an intermediate noncompetitive point, 60 miles from Los Angeles, on one of the competing rail lines, is not prohibited by the act, since the circumstances and conditions are substantially dissimilar.

In Equity. Petition filed by the Interstate Commerce Commission to enforce an order requiring certain railroad companies to desist from charging a greater rate for a shorter than for a longer haul. Dismissed.

*M. T. Allen*, U. S. Atty., and *Harris & Gregg*, for petitioner.

*A. Brunson* and *C. N. Sterry*, for defendants.

Ross, District Judge. This proceeding was instituted by virtue of the sixteenth section of the act of congress entitled "An act to regulate commerce," as amended March 2, 1889, (25 St. at Large, p. 855,) to enforce an order made by the Interstate Commerce Commission on the 19th day of July, 1890, directing that, from and after September 1, 1890, the defendants, the Atchison, Topeka & Santa Fe Railroad Company, the Atlantic & Pacific Railroad Company, the Burlington & Missouri River Railroad Company, the California Central Railway Company, the California Southern Railroad Company, the Chicago, Kansas & Nebraska Railway Company, the Missouri Pacific Railway Company, and the St. Louis & San Francisco Railway Company, cease and desist from charging or receiving any greater compensation, in the aggregate, for the transportation in car-load lots of certain enumerated commodities over their several lines or the routes formed by them, from Kansas City, St. Louis, Detroit, Cincinnati, or New York, or from corresponding points, for the shorter distance to San Bernardino, in the state of California, than for the longer distance over the same line, in the same direction, to Los Angeles, in the state of California. The order of the commission here sought to be enforced was made in a proceeding instituted before that body by a complaint on the part of the San Bernardino Board of Trade, setting forth that the railroad companies above men-

tioned were charging and receiving higher rates for each car load of reapers, mowers, harvesters, hay presses, plows, horse rakes, seed drills, corn planters, forks, (hay or manure,) hoes, hand rakes, shovels, spades, bags, burlap and gunny, compressed in bales, beer in glasses or stone, packed bottles, wine or beer in bulk, coffee in sacks, crockery, common china and white ware, packed, chairs, common wooden seated, cane seated, perforated, worth not more than nine dollars a dozen, school furniture, iron, bar or rod, fruit and jelly glasses, pumps, steam or hydraulic, sewing machines, soap, Castile, imitation Castile, common balls, and laundry, stoves, ranges, registers, radiators, black iron stove furniture and hollow ware, sugar, buggies and carriages, and farm wagons without springs, from the Missouri river, St. Louis, Chicago, Cincinnati, Detroit, and New York, over the same line, in the same direction, to San Bernardino, than to Los Angeles, San Bernardino being the shorter and Los Angeles the longer distance; thereby giving Los Angeles an unlawful preference over San Bernardino. To this complaint a demurrer was interposed by the Burlington & Missouri River Railroad Company, and answers were filed by the other defendant companies. The commission held that the complaint was sufficient to put the carriers to proof that the services were rendered under such dissimilar circumstances as to justify the greater charge for the shorter haul; and, after hearing evidence, found certain facts, which are set out in its report and opinion. Holding that the greater charge for the shorter haul was not justified by the facts found, the order was entered which this court is now asked to enforce.

The petition of the commission for such enforcement sets forth, among other things, that, subsequent to the filing of the complaint of the San Bernardino Board of Trade before the commission, the California Central Railway Company and the California Southern Railroad Company were consolidated, and constituted into a new corporation, under and by virtue of the laws of California, called the "Southern California Railway Company," which last-mentioned corporation claims to have some interest in the subject-matter of this suit, and accordingly it is also made a defendant herein.

To the petition all of the defendant companies, except the Chicago, Kansas & Nebraska Railway Company, filed an answer, admitting the allegations of the petition respecting the corporate existence of the defendant companies, and the location of their principal places of business; also the consolidation of the California Central Railway Company and the California Southern Railroad Company, forming the Southern California Railway Company; but alleging that, in addition to the California Central Railway Company and the California Southern Railroad Company, the Redondo Beach Railway Company, at the time being a corporation duly incorporated under the laws of California, having its principal place of business in the city of Los Angeles, was duly consolidated with the aforesaid two companies, under the name of Southern California Railway Company; that the Redondo Beach Railway Company, at the time of such consolidation, owned and operated a line of

road running from Los Angeles city, and there connecting with the California Central Railway Company, westerly to Redondo Beach, a point immediately upon the shore of the Pacific ocean, which road is now a part of the line owned and operated by the Southern California Railway Company. The defendants, answering, also admit that all of the aforesaid corporations, except the Southern California Railway Company, and its component corporations, were at the times mentioned in the petition, and still are, common carriers, engaged in the transportation of persons and property by their railroads extending through several of the United States, under a common control, management, or arrangement for a continuous carriage, and were then engaged in such business from the Missouri river, St. Louis, Chicago, Cincinnati, Detroit, and New York to Barstow, in the county of San Bernardino, state of California. But the defendants, answering, deny that they are interstate common carriers between Barstow and Los Angeles or San Bernardino, and allege that the defendant companies, other than the Southern California Railway Company, carry only from the eastern points named to Barstow, where all goods and merchandise shipped and hauled by them as common carriers are turned over and delivered to the Southern California Railway Company; that said Southern California Railway Company is a corporation organized and existing under the laws of California, having its principal place of business in the city of Los Angeles, and neither owns nor operates any line of railroad outside of the state of California, and is not subject to the provisions of the interstate commerce act. The answer admits the proceedings before the Interstate Commerce Commission as stated in the petition, but alleges that neither the Redondo Beach Railway Company nor the Southern California Railway Company was a party thereto, and that neither of them had a hearing before the commission upon any of the matters in question. The defendants, answering further, allege, among other things, as reasons why the order of the commission should not be enforced, that the true and existing state of facts as to ocean competition existing at the time of the filing of the petition by the San Bernardino Board of Trade, and of the answers of the respective defendants therein, were not fully proven and established before the commission; but that when the petition was filed, and when those answers were made, and when the hearing thereon was had, there did actually exist such water competition as to take the rates upon freight to Los Angeles out of the operation of the interstate commerce act, and that the carrying and transportation of the freight in question to Los Angeles and San Bernardino was not under substantially similar circumstances and conditions, but was made wholly dissimilar by reason of water competition actually existing; and, further, that, since the making of the order here sought to be enforced, there has grown up and now exists a new, substantial, and continuous competition, by ocean carriers, between all of the points east of the Missouri river named in the pleadings herein and the Pacific ports, including the ports of San Francisco, Redondo Beach, and San Pedro, and that there is now being carried by such ocean transportation large quantities of merchandise and

general freight, including the commodities mentioned in the petition filed by the San Bernardino Board of Trade before the Interstate Commerce Commission, to the ports aforesaid, in rivalry with and in competition to the overland carrying by the defendant companies, and that such competition is actual and present and is increasing; and that the defendant companies, by reason of such competition, have been compelled to make special rates to terminal points upon the Pacific coast, including among the number the city of Los Angeles; that the Redondo Beach Railway Company, now forming part of the Southern California Railway Company, by reason of its aforesaid consolidation, creates a continuous line through to the ocean at Redondo Beach, through which point, directly from the east and from the shipping points named in the petition of the San Bernardino Board of Trade, large quantities of freight are now being consigned and shipped directly to Los Angeles, and to the port of San Francisco, by steam and sailing vessels, and from Redondo Beach and San Pedro for Los Angeles. The defendants, answering further, allege that there are now four transcontinental lines of railroad from the east to the Pacific ocean, other than that formed by the defendant companies, namely: The Southern Pacific Railroad Company, operating its line of road from the city of San Francisco to Galveston, Tex., and other points east, running through the city of Los Angeles, and passing (three miles) south of San Bernardino; the transcontinental line composed of the Central Pacific and Union Pacific Railroad Companies, operating a line from San Francisco to Omaha, and there connecting with other roads to the eastern markets; the Northern Pacific Railroad Company, operating a line of road between Portland, Or., and Duluth, Minn., and other eastern points; the Canadian Pacific Railroad Company, operating a line of road through the British possessions from ocean to ocean. That all of these roads, other than that of the defendant companies, are engaged as common carriers in the transportation of freight from all of the eastern points named in the petition herein to the Pacific ocean, and thence down the Pacific coast, both by water and rail, to Los Angeles, from which point distribution is made to other points inland; that over all of said lines, other than that of the defendant companies, Los Angeles, though an intermediate, is recognized as a terminal, point; that neither of said companies, other than the defendants, was mentioned in the complaint filed by the San Bernardino Board of Trade before the Interstate Commerce Commission, and that neither of them is bound by its order, the enforcement of which against the defendant companies would be to subject them to an undue and unreasonable disadvantage in the carrying of freight, by reason of the other transcontinental lines not being subject to the same order, and the same charges for transportation to like common points.

Much time was consumed in the taking of testimony on behalf of the respective parties, and the case has been but recently submitted. For the commission, it is contended, in the first place, that under no circumstances can any carrier, subject to the provisions of the interstate commerce act, charge or receive for transportation of freight a greater com-

pensation for a shorter than for a longer haul over the same line, in the same direction, unless upon application to the commission such carrier be, in the particular case, authorized to charge less for the longer than for the shorter distance.   If this be the true construction of the act in question, the case is, of course, ended here; for not only was no such authority given in this case, but the order which it is sought to enforce expressly directed that the defendant companies should not charge or receive any greater compensation for the shorter haul to San Bernardino than for the longer haul to Los Angeles.   In support of the construction thus contended for, it is said that "the law points out but one method of escape from the universal application of the prohibitory features of the fourth section of the act, and that is through an application to the commissioners, who alone are given, in the exercise of a sound discretion, the right to suspend the provision in particular cases, and their findings are not reviewable by any other tribunal, because the law has confided to the commissioners, as a special tribunal, the authority to hear and determine the question."   But the fundamental difficulty in the way of adopting the construction now and thus contended for by the commission is that the act in question does not make it unlawful to charge or receive more for the shorter than the longer haul, under all circumstances, but only where the circumstances and conditions are substantially similar.   By the first section of the act (24 St. at Large, p. 379) it is declared that all charges made for any service rendered or to be rendered, in the transportation of passengers or property by any carrier subject to its provisions, shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful.   By the second section, every unjust discrimination, as between persons for doing a like and contemporaneous service in the transportation of a like kind of traffic, under substantially similar circumstances and conditions, is prohibited and declared unlawful.   By the third section it is declared to be unlawful "for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever;" and then follows section 4,—the sections particularly applicable to the present question,—which reads:

"That it shall be unlawful for any common carrier subject to the provisions of this act to charge or receive any greater compensation in the aggregate for the transportation of passengers or of like kind of property, under substantially similar circumstances and conditions, for a shorter than for a longer distance over the same line, in the same direction, the shorter being included within the longer distance; but this shall not be construed as authorizing any common carrier within the terms of this act to charge and receive as great compensation for a shorter as for a longer distance: provided, however, that, upon application to the commission appointed under the provisions of this act, such common carrier may, in special cases, after investigation by the

commission, be authorized to charge less for longer than for shorter distances for the transportation of passengers or property; and the commission may from time to time prescribe the extent to which such designated common carrier may be relieved from the operation of this section of this act."

It is obvious that the authority and power conferred upon the commission by the proviso contained in section 4 is limited to cases that fall within the enacting clause of that section, for its purpose manifestly is to enable the commission to relieve carriers from its operation in cases where it deems such action proper. Such purpose is also expressly declared in the concluding clause of the proviso. And the power thus conferred is exclusive, and its exercise conclusive, in all cases that fall within the prohibition of the enacting clause of the section to which the proviso is appended; that is to say, to every case where the carrier charges or receives greater compensation in the aggregate for the transportation of passengers, or of like kind of property, under substantially similar circumstances and conditions, for a shorter than for a longer distance, over the same line, in the same direction, the shorter being included within the longer distance. In all such cases, a greater charge for the shorter than for the longer haul is absolutely prohibited, unless the commission, for good cause, sees proper to relieve a particular carrier from its operation. But, if the circumstances and conditions are not substantially similar, the prohibition imposed by the statute does not apply at all. This question the court must determine. If it finds that the circumstances and conditions under which the greater charge was made for the shorter than for the longer haul in question were substantially similar, the inquiry ends, and the order of the commission must be enforced; for in such case it was the exclusive province of the commission to determine whether or not there existed such other circumstances as would make it proper to authorize the defendant companies to charge and receive greater compensation for the shorter than for the longer haul. But, if the case shows that the greater charge for the shorter than for the longer haul was made under substantially dissimilar circumstances and conditions, (there being no claim that the compensation charged and received for the shorter haul was otherwise unjust or unreasonable,) then, and in that event, it is manifest that the case does not fall within the prohibition of the interstate commerce act at all. This construction of the statute is in accord with that adopted by the Interstate Commerce Commission itself in *Re Southern Ry. & S. S. Ass'n*, 1 Int. St. Com. R. 280, where the commission, speaking through Judge COOLEY, after quoting the prohibitory clause of section 4, said:

"Here we have clearly stated what is unlawful and forbidden, and for doing the unlawful and forbidden act penalties are then provided. But that which the act does not declare unlawful must remain lawful if it was so before, and that which it fails to forbid the carrier is left at liberty to do without permission of any one. The charging or receiving the greater compensation for the shorter than for the longer haul is seen to be forbidden only when both are under substantially similar circumstances and conditions; and therefore if in any case the carrier, without first obtaining an order of relief, shall depart from the general rule, its so doing will not alone convict it of illegal-

ity, since, if the circumstances and conditions of the two hauls are dissimilar, the statute is not violated. Should an interested party dispute that the action of the carrier was warranted, an issue would be presented for adjudication, and the risks of that adjudication the carrier would necessarily assume. The later clause in this same section, which empowers the commission to make orders for relief in its discretion, does not in doing so restrict it to a finding of circumstances and conditions strictly dissimilar, but seems intended to give a discretionary authority for cases that could not well be indicated in advance by general designation, while the cases which upon their facts should be acted upon as clearly exceptional would be left for adjudication when the action of the carrier was challenged. The statute becomes, on this construction, practical, and this section may be enforced without serious embarrassment. From the recital of the history of the framing of this section, (which is given further on,) it appears, among other things, that the proviso respecting orders for relief was devised by the senate committee which originally drafted the section, and that it was an essential part of it as first proposed; the prohibitory part of the section being then quite stringent, but a discretion being conferred upon the commission to relieve against its operation. Afterwards the words, 'under substantially similar circumstances and conditions,' were inserted in the first sentence of the section. The proviso was perfectly intelligible, so long as the leading clause contained a hard and fast rule against charging more for the shorter than for the longer haul. It was then obvious that a discretion was left to the commission in the matter of relaxing the rule when different circumstances and conditions rendered such relaxation, in its judgment, proper. Had the section passed as it then stood, the exercise of such a discretion might have been entered upon by the commission with a distinct understanding of the task imposed, even though its adequate performance might have been out of the question; but, modified as it now stands, the necessity for a relieving order is greatly narrowed, it being obvious that no order is needed to relieve against the operation of the statute, when nothing is done or proposed which it makes unlawful.

"If any serious doubt of the proper construction of the clause of the statute now under review should, after careful consideration of its terms, still remain, it would seem that it must be removed when section 2, in which the same controlling word is made use of, is examined in connection. That section provides 'that if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive, from any person or persons, a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service, in the transportation of a like kind of traffic, under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful.' Here it will be observed that the phrase is precisely the same, and there can be no doubt that the words were carefully chosen, probably because they were believed to express more accurately and precisely than would any others the exact thought which was in the legislative mind; and in this section, as well as in section 4, the phrase is employed to mark the limit of the carrier's privilege,—its privilege, too, in respect to the very subject-matter with which section 4, where it is employed, has to do,—namely, the charges for transportation service. It is not at all likely that congress would deliberately, in the same act and when dealing with the same general subject, make use of a phrase which was not only carefully chosen and peculiar, but also controlling,

in such different senses that its effect, as used in one place, upon the conduct of the parties who were to be regulated and controlled by it would be essentially different from what it was as used in another. But, beyond question, the carrier must judge for itself what are the 'substantially similar circumstances and conditions' which preclude the special rate, rebate, or drawback, which is made unlawful by the second section, since no tribunal is empowered to judge for it until after the carrier has acted, and then only for the purpose of determining whether its action constitutes a violation of law. The carrier judges on peril of the consequences; but the special rate, rebate, or drawback which it grants is not illegal when it turns out that the circumstances and conditions were not such as to forbid it; and, as congress clearly intended this, it must also, when using the same words in the fourth section, have intended that the carrier whose privilege was in the same way limited by them should in the same way act upon its judgment of the limiting circumstances and conditions."

For the reasons above assigned, it seems to me to be clear that the court must determine the question whether or not the greater compensation charged and received by the defendant companies for the transportation of the commodities in question, for the shorter haul to San Bernardino than for the longer haul to Los Angeles, was under substantially similar circumstances and conditions; and in doing so it must be guided by the powers conferred and the duties imposed upon it by the sixteenth section of the act, as amended March 2, 1889, which reads as follows:

"Sec. 16. That whenever any common carrier, as defined in and subject to the provisions of this act, shall violate, or refuse or neglect to obey or perform, any lawful order or requirement of the commission created by this act, not founded upon a controversy requiring a trial by jury, as provided by the seventh amendment to the constitution of the United States, it shall be lawful for the commission, or for any company or person interested in such order or requirement, to apply in a summary way, by petition, to the circuit court of the United States, sitting in equity, in the judicial district in which the common carrier complained of has its principal office, or in which the violation or disobedience of such order or requirement shall happen, alleging such violation or disobedience, as the case may be; and the said court shall have power to hear and determine the matter, on such short notice to the common carrier complained of as the court shall deem reasonable; and such notice may be served on such common carrier, his or its officers, agents, or servants, in such manner as the court shall direct; and said court shall proceed to hear and determine the matter speedily, as a court of equity, and without the formal pleadings and proceedings applicable to ordinary suits in equity, but in such manner as to do justice in the premises; and to this end such court shall have power, if it think fit, to direct and prosecute in such mode, and by such persons as it may appoint, all such inquiries as the court may think needful to enable it to form a just judgment in the matter of such petition; and on such hearing the findings of fact in the report of said commission shall be *prima facie* evidence of the matters therein stated; and if it be made to appear to such court, on such hearing or on report of any such person or persons, that the lawful order or requirement of said commission drawn in question has been violated or disobeyed, it shall be lawful for such court to issue a writ of injunction or other proper process, mandatory or otherwise, to restrain such common carrier from further continuing such violation or disobedience of such order or requirement of said commission, and enjoining obe-

dience to the same; and in case of any disobedience of any such writ of injunction or other proper process, mandatory or otherwise, it shall be lawful for such court to issue writs of attachment, or any other process of said court incident or applicable to writs of injunction or other proper process, mandatory or otherwise, against such common carrier, and, if a corporation, against one or more of the directors, officers, or agents of the same, or against any owner, lessee, trustee, receiver, or other person failing to obey such writ of injunction or other proper process, mandatory or otherwise; and said court may, if it shall think fit, make an order directing such common carrier or other person, so disobeying such writ of injunction or other proper process, mandatory or otherwise, to pay such sum of money, not exceeding for each carrier or person in default the sum of five hundred dollars for every day, after a day to be named in the order, that such carrier or other person shall fail to obey such injunction or other proper process, mandatory or otherwise; and such moneys shall be payable as the court shall direct, either to the party complaining or into court, to abide the ultimate decision of the court, or into the treasury: and payment thereof may, without prejudice to any other mode of recovering the same, be enforced by attachment, or order in the nature of a writ of execution, in like manner as if the same had been recovered by a final decree *in personam* in such court.    When the subject in dispute shall be of the value of two thousand dollars or more, either party to such proceeding before said court may appeal to the supreme court of the United States, under the same regulations now provided by law in respect of security for such appeal; but such appeal shall not operate to stay or supersede the order of the court or the execution of any writ or process thereon; and such court may, in every such matter, order the payment of such costs and counsel fees as shall be deemed reasonable.    Whenever any such petition shall be filed or presented by the commission, it shall be the duty of the district attorney, under the direction of the attorney general of the United States, to prosecute the same; and the costs and expenses of such prosecution shall be paid out of the appropriation for the expenses of the courts of the United States.    If the matters involved in any such order or requirement of said commission are founded upon a controversy requiring a trial by jury, as provided by the seventh amendment to the constitution of the United States, and any such common carrier shall violate or refuse or neglect to obey or perform the same, after notice given by said commission as provided in the fifteenth section of this act, it shall be lawful for any company or person interested in such order or requirement to apply in a summary way, by petition, to the circuit court of the United States sitting as a court of law in the judicial district in which the carrier complained of has its principal office, or in which the violation or disobedience of such order or requirement shall happen, alleging such violation or disobedience, as the case may be; and said court shall by its order then fix a time and place for the trial of said cause, which shall not be less than twenty nor more than forty days from the time said order is made; and it shall be the duty of the marshal of the district in which said proceeding is pending to forthwith serve a copy of said petition, and of said order, upon each of the defendants; and it shall be the duty of the defendants to file their answers to said petition within ten days after the service of the same upon them as aforesaid.    At the trial of the findings of fact of said commission, as set forth in its report, shall be *prima facie* evidence of the matters therein stated; and if either party shall demand a jury, or shall omit to waive a jury, the court shall, by its order, direct the marshal forthwith to summon a jury to try the cause; but, if all the parties shall waive a jury in writing, then the court shall try the issues in said cause, and render its judgment thereon.    If the subject in dispute shall be of the value of two thousand dollars or more, either party may appeal to the supreme court of the United States, under the same regu-

lations now provided by law in respect to security for such appeal; but such appeal must be taken within twenty days from the day of the rendition of the judgment of said circuit court. If the judgment of the circuit court shall be in favor of the party complaining, he or they shall be entitled to recover a reasonable counsel or attorney's fee, to be fixed by the court, which shall be collected as part of the costs in the case. For the purposes of this act, excepting its penal provisions, the circuit courts of the United States shall be deemed to be always in session."

On the part of the commission it is contended that the facts found by it and set out in its report are conclusive upon the court. It is impossible so to construe the language of the statute conferring jurisdiction upon the court to enforce the lawful orders and requirements of the commission. Not only does the provision of the statute that the findings of fact contained in the report of the commission shall be taken as *prima facie* evidence of the matters therein stated preclude the idea that such finding shall be deemed conclusive evidence thereof, but such a construction would, in effect, be to convert the court from a judicial tribunal into an executive organ to carry out the orders of the commission. Courts are instituted to hear and determine causes; and to hear is to hear not one only, but both, sides to the controversy. And so congress, in the act under consideration, in conferring upon the circuit courts, sitting in equity, jurisdiction to hear petitions for the enforcement of the orders and requirements of the commission, has provided that such courts shall proceed to hear and determine such matters speedily, as a court of equity, without the formal pleadings and proceedings applicable to ordinary suits in equity, but in such manner as to do justice in the premises; and to this end "such court shall have power, if it think fit, to direct and prescribe, in such mode and by such persons as it may appoint, all such inquiries as the court may think needful to enable it to form a just judgment in the matter of such petition; and on such hearing the findings of fact in the report of said commission shall be *prima facie* evidence of the matters therein stated." It is, I think, very clear from this language that while congress, prescribing, as it lawfully might, a rule of evidence, made the findings of fact of the commission, as set forth in its report, *prima facie* evidence of the matters therein stated, they are not conclusive evidence of such matters; and that it is the duty of the court to examine the entire evidence submitted, and base its judgment upon the case as here established. This conclusion is in harmony with that of the court in *Kentucky & I. Bridge Co.* v. *Louisville & N. R. Co.*, 37 Fed. Rep. 567, and *Interstate Commerce Commission* v. *Lehigh Val. R. Co.*, 49 Fed. Rep. 177.

The real question, therefore, for the decision of the court, is whether or not the case shows that the circumstances and conditions existing at Los Angeles and San Bernardino, respecting the transportation of the commodities in question, are substantially dissimilar; and this is a mixed question of law and fact. It is said for the defendant companies that the facts in regard to that question were not fully presented to the Interstate Commerce Commission when the matter was there considered;

and attention is called to the fact that the commission itself has since held, in the case of *Rice* v. *Railroad Co.*, 3 Int. St. Com. R. 261, that Los Angeles is a terminal and competitive point in respect to petroleum and its products,—the traffic there involved,—and that the Atchison, Topeka & Santa Fe Railroad Company was justified, by the existence of substantially dissimilar circumstances and conditions, in making lower rates on that traffic to Los Angeles than to intermediate points.      Referring to the difference in situation between Los Angeles and San Francisco, Sacramento, Stockton, Marysville, Oakland, and San Diego, the commission there say:

"With reference to this traffic, the city of Los Angeles occupies a different position to that of the water terminals named.  It appears that this city receives petroleum and its products, important in amount, by the water lines to San Francisco or San Diego, as the case may be, and which is afterwards brought down the coast by the rail lines of the Southern Pacific Company or the Atchison, Topeka & Santa Fe Railroad Company, as the case may be, to Los Angeles.  It does not appear whether it is brought to Los Angeles on through bills of lading, or only on bills of lading from San Francisco or San Diego, as the case may be, and afterwards, on a separate bill, to Los Angeles; but this is not important, as, in either event, the practical result would be the same.  It may be brought to Los Angeles each way.  If it is a separate carriage by a water line to San Francisco or San Diego, and no further, then the rate that is thus made for its carriage is one that is not subject to the regulation provided by the act to regulate commerce, and if from San Francisco or San Diego, as the case may be, it is a separate carriage by a rail carrier to Los Angeles, then it is a service beginning and ending in the state of California, and, as such, not subject to the regulation provided by the act to regulate commerce.  The dealer in these products at Los Angeles has a right to demand that the rail carrier shall take these articles brought by the water lines to San Francisco or San Diego, as the case may be, and bring them to him at Los Angeles at reasonable rates; and these rates might be reasonable and be less in amount than the difference, for example, between the amount of the water rate to San Francisco or San Diego and the amount of the all-rail rates to these points.  Such a state of facts creates a substantial dissimilarity of circumstances and conditions in reference to the transportation of this traffic to Los Angeles that prevents the lower all-rail rate to that city upon these products from being a violation of section 4 of the act to regulate commerce.  These circumstances and conditions are strongly competitive, and on one side they are subject to the regulation provided by the act to regulate commerce, while on the other they are not.  They fairly warrant the all-rail carriers, who are subject to the act to regulate commerce, in making such just and reasonable rates on this traffic as will enable them to meet at Los Angeles the rates of carriers not subject to the act to regulate commerce, even though in doing so they charge lower rates than at intermediate stations, where no such circumstances and conditions exist.  On the other hand, if this traffic is brought from New York, for example, by water lines to San Francisco or San Diego, and from the one or the other of these two last-named sea ports, as the case may be, to Los Angeles, under a through bill of lading, then it is manifest, upon the evidence in this proceeding, that it would be so brought from New York to Los Angeles at as low, if not a lower, rate than the all-rail rate from points east of the ninety-seventh meridian of longitude to Los Angeles; and being, as we have already seen, important in amount, would also be in actual competition with the all-rail rate, so that the rail carriers would be justified in meeting it by the all-rail rate."

v.50F.no.4—20

Freight carried to or from a competitive point, said Judge DEADY in *Ex parte Koehler*, 1 Int. St. Com. R. 319—

"Is always carried under 'substantially dissimilar circumstances and conditions' from that carried to or from noncompetitive points. In the latter case the railway makes its own rates, and there is no good reason why it should be allowed to charge less for a long haul than a short one. When each haul is made from or to a noncompetitive point, the effect of such discrimination is to build up one place at the expense of the other. Such action is willfully unjust, and has no justification or excuse in the exigencies or conditions of the business of the corporation. In the former case the circumstances are altogether different. The power of the corporation to make a rate is limited by the necessities of the situation. Competition controls the charge. It must take what it can get, or, as was said in *Ex parte Koehler*, 'abandon the field, and let its road go to rust.' Competition may not be the only circumstance that makes the condition under which a long and a short haul are performed substantially dissimilar. But certainly it is the most obvious and effective one, and must have been in the contemplation of congress in the passage of the act."

The common carrier cannot be required to ignore or overcome existing differences in the transportation facilities of different localities, created, not by its own arbitrary action, but by nature or by enterprises beyond its control. San Bernardino is situated in one of the most fertile and productive valleys in the world, and is a thriving and prosperous city, but it has not the transportation facilities that Los Angeles has. It is about 60 miles distant, and further inland. By reason of its nearness to Los Angeles, it receives the benefit of the competitive rates to that terminal in proportion to its proximity thereto. But, not being a competitive point, it does not get terminal rates. The proof shows, what is also a matter of common knowledge, that railroad companies do not make terminal rates, unless compelled to do so by competition. Wherever and whenever actual competition exists, the question the carrier has to deal with is not so much what is a fair rate for the service, or what the traffic will bear, but what rate can be got for the service as against the rate offered by the competitor. Especially is this true when the competitor is a carrier by water, because that is the cheapest known kind of transportation, and is unrestricted by law. If, therefore, Los Angeles can be justly regarded as a competitive point in respect to the transportation of the commodities here in question, there is such dissimilarity of circumstances and conditions between it and the intermediate point of San Bernardino as to make the long and short haul clause of the interstate commerce act inapplicable.

The facts in respect to this question, as shown by the evidence submitted to the court, are widely different from those set out in the report of the commission, and upon which its order here sought to be enforced was based. In its report and opinion the commission say:

"Between San Francisco and the southern border of California, a distance of six hundred miles, San Jose, Los Angeles, and San Diego are the only points designated Pacific coast terminals by said transcontinental association, and to which rates from the Missouri river and more eastern points are the same as to San Francisco. San Jose is an interior city, within fifty miles of

San Francisco. Los Angeles is also an interior city, 25 miles from San Pedro, its nearest harbor. The rates between Los Angeles and San Pedro are from 9 to 12½ cents per 100 pounds on goods similar to those named in the complaint. Los Angeles and San Diego are the principal commercial centers of southern California. San Pedro is a seaport through which importations of coal, lumber, and other commodities from the neighboring islands and British America are brought in, and vessels come in ballast from San Francisco to San Pedro, to be loaded with grain, but its commerce is very small. None of the articles named in the complaint shipped from the Missouri river, or places further east, have reached Los Angeles through San Pedro for many years. Seven or eight years ago some agricultural implements were shipped around Cape Horn to San Francisco. The time when shipment of any of the articles named in the complaint was made from the east directly through San Pedro or other Pacific coast port to Los Angeles was not within the recollection of any witness testifying. Some goods are shipped from New York by water to New Orleans; thence by rail to California and intermediate places. Practically, there is no such thing as water competition or a water route from the Missouri and Mississippi rivers and interior cities to the Pacific coast in the carriage of the articles named. Many of them, such as stoves, ranges, black hollow ware, when carried over a water route, are liable to injury from rust. It is possible to ship most of the articles named in the complaint from Atlantic ports and cities around Cape Horn to ports and cities on the Pacific coast. None are so shipped to or through San Diego or San Pedro, Cal. To what extent they are so shipped to San Francisco, or through it to Los Angeles, if at all, has not been disclosed by the testimony or otherwise ascertained in this investigation."

And again:

"The agent of one of the defendant roads testified that seven or eight years ago some agricultural machinery was carried around Cape Horn to San Francisco, and on this testimony alone rests the claim of water competition to Los Angeles, nearly five hundred miles from San Francisco. That the merchandise named in the complaint is not carried by sea from New York, or by sea and rail from Cincinnati and interior points, to Los Angeles, through San Pedro, appears from the evidence, and is confirmed by the fact that the rail rates are higher to San Pedro than to Los Angeles. If they were so carried through San Diego, they would necessarily go at the same rate to San Bernardino, which is a trifle nearer than Los Angeles by rail to San Diego. Possible competition by water is not sufficient to justify a greater charge for the shorter distance. Under the provisions of the fourth section of the act to regulate commerce, the competition must be actual and so counteracting as to take the freight if the lower charge for the longer distance was not maintained. Such competition to Los Angeles is not established by the fact that some of the articles named in the complaint were carried by sea to San Francisco seven or eight years ago."

Reference has already been made to the subsequent case of *Rice* v. *Railroad Co.*, where the facts were by the commission held to be such as to establish the claim of the defendant that Los Angeles is such competitive point in respect to the transportation of petroleum and its products as to justify a less charge for the longer haul to that city than for a shorter haul to intermediate points. When the present case was before the commission, one port, (Redondo,) through which the evidence shows large quantities of freight of various kinds are almost daily received at Los Angeles, was not shown to have existed at all. This port

is distant about 18 miles from Los Angeles, and is connected therewith by two railroads,—one formerly known as the "Redondo Beach Railway Company" and the other as the "California Southern Railroad Company." Through the port of San Pedro, also, which is distant from Los Angeles about 22 miles, and connected therewith by rail, large quantities of freight, of almost all kinds and classes, are almost constantly received. All of the freight thus brought to Redondo and San Pedro for Los Angeles is brought by steamer or sailing vessel, much of it in original packages, from New York to San Francisco, and from there transhipped to Los Angeles by way of Redondo or San Pedro; some of it by the Canadian Pacific Railroad to Vancouver, and thence by the Pacific Coast Steamship Company's ships to Redondo or San Pedro. Some freight is also brought by water to San Francisco and San Diego, and thence down or up the coast, as the case may be, by rail to Los Angeles. The evidence shows that in addition to the five overland railroads, to wit, the Canadian Pacific, the Northern Pacific, the Central Pacific, the Atchison, Topeka & Santa Fe, and the Southern Pacific, with their various connections, by which freight is transported from the eastern and middle states to California, there is what is called the Dearborn line of sailing vessels between New York and San Francisco, the Sutton line of sailing vessels between New York and San Francisco and Portland, the Pacific Mail Steamship Company's line of vessels from New York to Aspinwall, connecting there with the Panama Railroad running to Panama, and at that place with the company's line of steamers to San Francisco, and that recently there has been established a line of steamships between New York and San Francisco by way of the straits of Magellan, on some of which, at the time of the taking of the testimony herein, there was afloat a large amount of freight of various kinds and classes for some of the Los Angeles merchants. Los Angeles is a city of about 60,000 people, and because of its location in respect to transportation facilities, and because it is the most important point in southern California, it was made one of the terminal points of the Pacific coast by the transportation companies. The evidence shows that a number of the large mercantile firms of San Francisco, dealing in some or all of the commodities mentioned in the petition, have branch houses there, some have agents, and that some of the local firms do business to the amount of $3,000,000 per annum. It is not strange, therefore, that there should be active competition between the carriers for the transportation of its freight. The witness A. M. Sutton testified, among other things, that he represents in San Francisco the line of clipper ships which are and have been for years running from New York and Philadelphia around Cape Horn to San Francisco; that they carry almost every kind and class of freight, including the commodities mentioned in the petition; that they charter and load from 30 to 35 ships a year, have no fixed rates, but make rates so as to compete with the other water carriers, and with the overland railroads, and so as to get the business; that they solicit business as far west as Kansas City, St. Paul, Milwaukee, Pittsburg, and Chicago; that they solicit freight for

all parts of California, Oregon, and Washington; that they carry freight constantly to southern California, chiefly to Los Angeles; that their ships take all California freight to San Francisco, and, if billed to Los Angeles, it is reshipped to San Pedro or Redondo in original packages, and then by rail to Los Angeles.    The witness Edwin Goodall testified, among other things, that he represents in San Francisco the Pacific Coast Steamship Company; that their ships go to San Pedro and Redondo, to which ports within the last two years freights from San Francisco have been as low as one dollar a ton by reason of competition with other water carriers and the railroads; that they are engaged in the transportation of all kinds and character of merchandise; that goods shipped in New York by steamers or clippers for Los Angeles and San Bernardino are constantly reshipped at San Francisco in original packages to San Pedro and Redondo, from which they are taken by rail; that they sometimes run two or three freight steamers a week to those ports, and including their passenger steamers, which also carry freight, they would probably average one every other day; that they endeavor to fix their rates so as to successfully compete with whatever opposition they may have, whether from carriers by water or rail.

In the report and opinion of the commission, in finding, as it did, from the evidence before it, that practically there was no such thing as water competition or a water route from the Missouri and Mississippi rivers and interior cities to the Pacific coast in the carriage of the articles named, it is said: "Many of them, such as stoves, ranges, black hollow ware, when carried over a water route, are liable to injury from rust."    In the case here, A. A. Watkins, a member of the firm of W. W. Montague & Co., whose principal place of business is in the city of San Francisco, with a branch house in Los Angeles, testified that his firm deals largely in stoves, ranges, registers, radiators, black iron stove furniture, and hollow ware, and that of those commodities they ship what would probably amount to about 75 car loads a year, and that about 75 per cent. of them they ship by water to San Francisco, and from there reship by steamer to Redondo or San Pedro what is intended for Los Angeles and vicinity; that they ship by water because it is cheaper to do so than by rail, after deducting their estimate of 3 per cent. for loss by rust; and that any increase in the rail tariff would result in their shipping still more largely by water.    The testimony in the case is altogether too voluminous to refer to in detail, but I think it is safe to say, generally, that it shows that the water carriers mentioned are now, and that some of them for years past have been, competing with the overland railroads for the carriage of general freight, including the commodities mentioned in the petition, from the cities and country east of the Missouri river to the Pacific coast, including the city of Los Angeles; that they are and have been actively engaged in such transportation, soliciting the freight, and carrying what they can get; and that they actually do carry an important part of many of the commodities mentioned in the petition.    The fact that such means of transportation actually exists, and is actually and actively seeking the traffic, constitutes compe-

tition, and was doubtless one of the most important factors in making Los Angeles a terminal point. Not only does the evidence show that such water competition exists, but it shows that the shipments by water are increasing; and a number of the witnesses testify that, in the event the all-rail rates should be increased from what they are now, it would result in much larger shipments by water, both in quantity and kind. For the reasons stated I am of the opinion that the circumstances and conditions attending the transportation of the commodities in question to Los Angeles and San Bernardino are essentially dissimilar, and therefore that the long and short haul clause of the interstate commerce act does not apply to the case. As has been said, it is not claimed that the rates to San Bernardino are otherwise unjust or unreasonable. If they are, other provisions of the act will afford relief. It results from these views that petitioner is not entitled to the relief it seeks in this court. It is accordingly ordered that the petition be dismissed, at its cost.