INTERSTATE COMMERCE COMMISSION v. LEHIGH VALLEY R. CO.

(Circuit Court, E. D. Pennsylvania. May 11, 1896.)

1. INTERSTATE COMMERCE—COST OF CARRIAGE.
   The fact that the cost of carriage of all coal upon an entire railroad system, from all points of shipment to all destinations, is a certain per cent. of the gross receipts from all coal, is no reason for concluding that upon a particular line or part of the system the cost of carriage bears the same ratio to the coal receipts of that particular line or part.

2. SAME—ORDERS MADE BY THE COMMISSION.
   An order made by the commission, which rests upon an erroneous principle and is unreliable, cannot be sustained, and is not to be judicially enforced.

3. SAME—POWER OF THE COMMISSION TO FIX RATES.
   The commission is not clothed with the power to fix rates.

In Equity.

Simon Sterne and Robert Ralston, for complainants.
John G. Johnson, for defendant.

ACHESON, Circuit Judge. On October 19, 1888, Coxe Bros. & Co., of Drifton, Luzerne county, Pa., miners and shippers of anthracite coal, filed a complaint with the interstate commerce commission against the Lehigh Valley Railroad Company, charging that company with specified violations of the provisions of the act of congress approved February 4, 1887, entitled "An act to regulate commerce." The proceeding before the commission resulted in a finding by the commission that the rates and charges established by the defendant, and then in force over and upon its lines of railroad, for the transportation of anthracite coal from the locality known as the "Lehigh Anthracite Coal Region," in the state of Pennsylvania, to Perth Amboy, in the state of New Jersey, were unreasonable and unjust; and on March 13, 1891, the commission made and issued an order in the following terms:

"It is ordered and adjudged that the defendant, the Lehigh Valley Railroad Company, do, from and after the 20th day of April, A. D. 1891, wholly cease and desist from charging any greater compensation for the transportation of divers kinds and sizes of anthracite coal, delivered to it by complainants and other shippers for carriage from shipping points on its lines of railroad at or near the coal mines and collieries of complainants in the mining locality known as the 'Lehigh Anthracite Coal Region,' to wit, from Drifton, Eckley, Gowen, Tomhicken, Deringer, and Stockton, all in the county of Luzerne and state of Pennsylvania, and Beaver Meadow, in the county of Carbon and state of Pennsylvania, to Perth Amboy, in the state of New Jersey, than the following rates of charge per ton of two thousand, two hundred and forty (2,240) pounds of each or either of said divers known kinds and sizes of anthracite coal, that is to say: One dollar and fifty cents ($1.50) per said ton on the sizes and kinds known as larger or prepared sizes, and also and more specifically known as lump, steamboat, broken, egg, stove, and nut coal; one dollar and twenty-five cents ($1.25) per said ton on the size or kind known as pea coal; one dollar and five cents ($1.05) per said ton on the size or kind known as buckwheat coal; one dollar and five cents ($1.05) per said ton on the size or kind of coal known as culm."

The railroad company having refused and failed to obey this order, the interstate commerce commission applied by petition to this

court, sitting in equity, praying for a writ of injunction, or other proper process, to restrain the railroad company from the further violation of such order, and for the enforcement thereof. To this petition the railroad company filed its answer. The answer, among other matters of defense, denies that the rates established and charged by the defendant for the transportation of anthracite coal as aforesaid were unreasonable and unjust; alleges that the rates by it then charged, and since continued by it to be charged, were reasonable and just; and avers that all the findings of fact by the commission which led it to the conclusion that the rates charged by the defendant were unreasonable and unjust were erroneous and against the evidence, and that the reasoning upon which the commission rested its conclusion was fallacious and unsound. The case is now before us upon the pleadings, the report of the commission, the evidence taken by the commission, and additional proofs taken by an examiner appointed by the court. In considering the question of the reasonableness of rates, we will not go beyond one particular matter of fact. The commission found, and in its report states, that the operating cost of carrying a ton of anthracite coal from the Lehigh anthracite regions to Perth Amboy was 85 cents. This conclusion the commission deduced from the Lehigh Valley Railroad Company's annual report for the year ending November 30, 1887. In the report of the commission are the following statements and tables:

"The business; receipts, with sources from which derived; expenses, and on what account incurred,—for year ending Nov. 30, 1887, as appears from the annual report of said railroad company, were:

|  | Carried One Mile. | Gross Rec'ts. | Expenses. | Net Receipts. |
|---|---|---|---|---|
| Coal, tons | 513,889,171 02 | $6,165,411 29 | $3,431,609 83 | $2,733,801 46 |
| Other freight, tons | 253,564,921 56 | 2,430,761 13 | 1,902,595 93 | 528,165 20 |
| Passenger, express and mail | 44,512,264 10 | 1,122,883 65 | 808,190 49 | 314,693 16 |
| Totals | | $9,719,056 07 | $6,142,396 25 | $3,576,659 82 |

"* * * From the above reported facts, it appears that the ton-mile receipts, expenses, and profits, or net receipts, for the year 1887, were on:

|  | Gross Receipts per Ton per Mile, Mills. | Expenses per Ton per Mile, Mills. | Net Receipts per Ton per Mile, Mills. |
|---|---|---|---|
| Coal | 12.00 | 6.67 | 5.32 |
| General freight | 9.58 | 7.50 | 2.08 |

"The operating expenses for the transportation of all freight are 63 per cent. of the reported operating income, while the cost of transporting coal is but 56 per cent. of the income from coal, as appears from the said annual report of 1887. The estimated cost of carrying coal from the Lehigh and Mahanoy regions to Perth Amboy, based on said report, is 85 cents per ton, which, for the group or average distance of 149 miles, is nearly six mills per

ton per mile, taking the tide coal as an average; some being carried to other points at lower, and some at higher, rates."

Now, certainly, there is no statement in the railroad company's report to the effect that the cost of carrying coal from the Lehigh and Mahanoy regions to Perth Amboy was 85 cents per ton. That is the estimate of the commission, and it purports to rest upon the report of the railroad company for the year 1887. That report shows that the gross receipts from all coal carried by the defendant during the year averaged 12 mills per ton per mile, and that the average cost of carrying each ton of coal per mile was 6.67 mills. Upon the basis of this average cost per mile, namely, 6.67 mills, the cost of transporting a ton of coal from the Lehigh and Mahanoy regions to Perth Amboy (149 miles) would be 99.38 cents. By what method, then, did the commission proceed in making its estimate? No satisfactory answer to this inquiry is to be found in the report of the commission. The counsel for the commission, in a supplemental brief furnished the court since the hearing of the case, makes this explanation:

"The correct method of obtaining such cost of transportation, and the method which the commission has again stated, since the argument, to have been the one adopted by it, is shown as follows."

The counsel then states that the commission found from the railroad company's report for 1887 that the operating expense on all coal carried from all points of shipment to all destinations during that year was about 56 per cent. of the gross coal receipts; that the commission ascertained that the average rate charged by the company for carrying the larger sizes of coal from the Lehigh and Mahanoy mines to Perth Amboy in 1887 was $1.54 per ton, and that the average rate charged upon the pea, buckwheat, and culm was $1.36 per ton; that the commission estimated that 75 per cent. of this tonnage took the $1.54 average rate, and that 25 per cent. thereof took the $1.36 average rate, and hence that the average revenue per ton from this tidal coal was $1.495. The counsel's brief then proceeds thus:

"The fair average gross receipts per ton actually obtained by the company in 1887 for carrying anthracite coal from the Lehigh and Mahanoy mines to Perth Amboy having thus been found to be $1.495 per ton, and it having also been ascertained, as above shown, that nearly 56 per cent. of the company's gross revenue from coal was absorbed by the cost of carriage, it follows that 56 per cent. of the average rate of $1.495 per ton would furnish 83.7 cents as the basis on which to estimate the cost of carrying a ton from said coal regions to Perth Amboy in 1887. The commission, to be entirely safe, increased this by 1.3 cents, and placed its estimate of the cost of carriage at 85 cents per ton. The calculation above described applies the coefficient of expenses on coal traffic (56 per cent. of gross receipts) directly to the traffic in question, and the receipts actually received for its transportation."

If the explanation thus given by the counsel for the commission is a correct statement of the method pursued by the commission in making its estimate of 85 cents, then, in our judgment, that method is without justification. For, having adopted an estimated average rate of revenue, namely, $1.495, from each ton of coal carried over the 149 miles from the Lehigh and Mahanoy regions to Perth Am-

boy, the commission assumed that the expenses of the transportation of coal over this particular branch of the defendant's railroad system was necessarily only the average cost of the carriage of all coal upon the defendant's entire system. The assumption which thus underlies the commission's estimate is unwarrantable. Merely because the cost of carriage of all coal upon the defendant's entire railroad system from all points of shipment to all destinations was 56 per cent. of the gross receipts from all coal, is no reason for concluding that upon a particular line or part of the system the cost of carriage bears the same ratio to the coal receipts from that particular line or part. The railroad company's report for 1887, upon which the commission based its estimate, does not furnish the data by which the actual cost of carrying coal from the Lehigh and Mahanoy mines to Perth Amboy can be ascertained. The commission therefore resorted to an estimate of the carrying cost. That estimate, however, as we have seen, rests upon an erroneous principle, and is unreliable. Hence the order based thereon cannot be sustained, and is not to be judicially enforced.

We have only to add that the evidence before us is quite convincing that the actual cost of transporting coal from the Lehigh and Mahanoy regions to Perth Amboy was and is considerably more than 85 cents per ton.

We pass now to the consideration of a defense of a legal character, raised by the twenty-fourth and twenty-fifth paragraphs of the defendant's answer, namely:

"(24) This defendant is advised by counsel, and therefore avers, that the act entitled 'An act to regulate commerce' does not authorize the said commission to fix the rates of transportation which shall be charged by railroad corporations. (25) This defendant is advised by counsel, and therefore avers, that the said act does not authorize the said commission to make the order which it made in this cause, set forth in Exhibit G, attached to the present petition."

These paragraphs raise the question of the power of the commission to fix maximum rates for transportation as was here done. Since the argument of this case that question has been considered by the supreme court of the United States in the cases of Cincinnati, N. O. & T. P. Ry. Co. v. Interstate Commerce Commission, 16 Sup. Ct. 700, and Interstate Commerce Commission v. Cincinnati, N. O. & T. P. Ry. Co., Id. The opinion of that court in these cases, delivered by Mr. Justice Shiras, was filed March 30, 1896. The order of the interstate commerce commission which was there involved contained this clause:

"And that the said defendants, the Cincinnati, New Orleans & Texas Pacific Railway Company. do also. from and after the 20th day of July, 1891, wholly cease and desist from charging or receiving any greater aggregate compensation for the transportation of buggies, carriages, and other first-class articles, in less than car loads, from Cincinnati aforesaid to Atlanta, in the state of Georgia, than $1.00 per hundred pounds."

This clause of the order was disapproved and annulled by the circuit court of appeals for the Fifth circuit; that court, however, not passing upon the question of the power of the interstate commerce commission to fix a maximum rate. The commission appealed to the supreme court, and, in its assignments of error, pre-

sented that question for determination.    In disposing of the appeal of the commission, the supreme court declared as follows:

"Whether congress intended to confer upon the interstate commerce commission the power to itself fix rates, was mooted in the courts below, and is discussed in the briefs of counsel.   We do not find any provision of the act that expressly, or by necessary implication, confers such a power.   It is argued on behalf of the commission that the power to pass upon the reasonableness of existing rates implies a right to prescribe rates.   This is not necessarily so.   The reasonableness of the rate, in a given case, depends on the facts; and the function of the commission is to consider these facts, and give them their proper weight.   If the commission, instead of withholding judgment in such a matter until an issue shall be made and the facts found, itself fixes a rate, that rate is prejudged by the commission to be reasonable. We prefer to adopt the view expressed by the late Justice Jackson, when circuit judge, in the case of Interstate Commerce Commission v. Baltimore & O. R. Co., 43 Fed. 37, and whose judgment was affirmed by this court (145 U. S. 263, 12 Sup. Ct. 844):  'Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at the common law,—free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are regarded as sound, and adopted in other trades and pursuits.' "

These views of the supreme court decisively show that the interstate commerce commission is not clothed with the power to fix rates which it undertook to exercise in this case.    The petition of the interstate commerce commission must be dismissed.    Let a decree to that effect be drawn.