## FARMERS' LOAN & TRUST CO. v. NORTHERN PAC. RY. CO.

### In re HOLLY et al.

(Circuit Court, D. Washington, N. D. October 16, 1897.)

### No. 337.

1. INTERSTATE COMMERCE — ORDERS BY INTERSTATE COMMERCE COMMISSION — ENFORCEMENT BY COURT.

In a proceeding in the circuit court under section 16 of the interstate commerce law to enforce an order made by the commission, the court has no general power to adjust differences between the litigants, or to correct abuses in the conduct by a railroad company of its business; and, unless a valid order has been made by the commission and violated by the company, no relief can be granted to the petitioners.

2. SAME—POWERS OF COMMISSION—FIXING RATES.

The interstate commerce commission is not authorized to fix rates either absolutely or relatively; and where the commission has assumed to make an order fixing rates, and a proceeding is brought to enforce such order, it is the duty of the court to declare the same to be null and void.

3. SAME.

An order made by the interstate commerce commission, which authorizes a railway company to make commodity rates on competitive traffic to terminal points, less than their rates on like traffic to an intermediate non-competitive point, but directs that such commodity rates must not be lower than necessary to meet competition, nor be applied to articles not actually subject thereto, is a mere general statement of the duty of the railway company as defined by the law, and is too indefinite to be the basis of a decree by the court to enforce obedience.

4. SAME—ROADS OPERATED BY RECEIVERS.

When a court which has appointed receivers for a railroad company is called upon to enforce an order made before such appointment by the interstate commerce commission, it cannot treat the petition merely as an appeal to the court to regulate the conduct of its receivers in the receivership case, but must apply to them the same rules and principles which would be applied if the railroad were being operated and managed by the officers and agents of the corporation itself. The receivers have the same right to question the validity of the order made by the commission as would the railroad company.

Frank H. Graves, for petitioners.
C. W. Bunn and W. A. Underwood, for Northern Pac. Ry. Co.
M. D. Grover, for Great Northern Ry. Co.

HANFORD, District Judge. This is a proceeding instituted by the merchants and shippers of the city of Spokane, under section 16 of the interstate commerce law, as amended by the act of March 2, 1889 (1 Supp. Rev. St. [2d Ed.] p. 688), to enforce the decision and

order of the interstate commerce commission in the case of Merchants' Union v. Northern Pac. R. Co., 5 Interst. Commerce Com. R. 478–513.

Spokane is one of the most ambitious and promising of the interior cities of the Northwest. It has many natural and acquired advantages as a site for a great manufacturing and commercial city, but it is situated 400 miles from the seaboard, and is wholly dependent upon railroads as carriers of its commerce. The merchants and business men of Spokane, being discontented because the transcontinental railroads were exacting a higher rate for through freight from Eastern terminals to Spokane than they were receiving for through freight from the East delivered at Portland and terminal points on Puget Sound, organized the Merchants' Union, and, by that name, prosecuted a complaint before the interstate commerce commission against the Northern Pacific Railroad Company and the Union Pacific Railway Company, which was then operating connecting lines of railway, under the general name of the Union Pacific System, extending from Omaha to Portland, in the state of Oregon, and with branches reaching to Spokane, which proceeding resulted in the decision and order above referred to, which order is as follows:

(1) The defendants herein, by reason of the competition at their Pacific terminals of carriers not subject to the act to regulate commerce, may make commodity rates on competitive traffic to those terminals which are less than their rates on like traffic to Spokane; but such commodity rates must not be lower than are necessary from time to time to meet such competition, nor allowed in any case on articles not actually subject thereto. (2) In the matter of car-load rates, mixed car-load lots at car-load rates, minimum weight of shipments entitled to car-load rates, and in all other respects, the defendants, and each of them, will furnish, provide, and allow the same privileges, facilities, and advantages on shipments to Spokane as are or may be at any time furnished, provided, or allowed on like shipments to Portland or other Pacific terminals. (3) On or before the 1st day of January, 1893, the defendants in this case, and each of them, will prepare, publish, and put in effect, tariff rates on all classified traffic from their Eastern terminals to Spokane, which shall be approximately eighteen per cent. less than the tariffs now in force at that point, and shall not materially exceed eighty-two per cent. of the class rates now applied both to Spokane and the Pacific terminals; and thereafter the defendants will not, nor will either of them, charge, collect, or receive for transportation from their Eastern terminals to Spokane a greater sum or amount than the rates fixed and prescribed by such reduced tariffs. The following named rates on each of the ten classes, respectively, shall be deemed a compliance with this requirement, viz.: Class 1, $2.90; 2, $2.46; 3, $2.05; 4, $1.64; 5, $1.44; A, $1.44; B, $1.28; C, $1.02; D, $0.90; E, $0.74. In case of any reduction in class rates to Pacific terminals, a further and corresponding reduction will be made on like shipments to Spokane, except as provided in the foregoing opinion. This order will apply not only to rates from St. Paul and other Eastern terminals of the defendants, but is intended to include directions for a corresponding reduction in the grouped rates from points east of St. Paul so far as they are applied to Spokane traffic. As the railroads which join with the defendants in making these rates have not been made parties to this proceeding, the case will be reopened, if necessary, for the purpose of bringing them in, to the end that all carriers affected may be bound by this order unless cause be shown for a different ruling.

In the year 1894, while the Northern Pacific Railroad was in the hands of receivers, the petitioners filed their petition herein, in which they complained that the receivers, in the operation of said railroad, were discriminating against Spokane in the matter of freight rates, in utter disregard of said order. Thereupon the court required the

receivers to answer said petition, and, after the issues had been made up, an order was entered appointing Mr. L. S. B. Sawyer, of San Francisco, master in chancery pro hac vice, and the case was referred to him to take the evidence, and make a full report covering the facts and law of the case. The Northern Pacific Railway Company has been substituted as respondent in place of the receivers, said company having acquired the property of the Northern Pacific Railroad Company, and become the successor of the receivers in the operation thereof, by purchase at the sale under a decree, foreclosing mortgages thereon. In the foreclosure decree it was expressly provided that the purchaser at the sale should take the property and business, subject to the rights of the petitioners in this proceeding, and should be bound by the decree of this court, upon the final determination of the issues involved herein, in the same manner and to the same extent as the receivers would be bound if such decree had been entered while the railroad remained in their control. The Great Northern Railway Company is operating a line from St. Paul, through Spokane, to Seattle; and, as the business of that company must necessarily be affected by the decision of this case, it has been permitted to introduce evidence and to be heard in the argument. Testimony and documentary evidence has been taken by said master, at the cities of Spokane, Seattle, and Tacoma, in the state of Washington, and in Portland, in the state of Oregon, and in San Francisco, Cal., and in St. Paul, Minn.; and said master has made a full and exhaustive report, setting forth the facts and his conclusions from the evidence taken, and his opinion upon the questions of law involved in the controversy. To this report, the petitioners have filed exceptions, and the case has been argued and submitted upon the questions raised by said exceptions.

For a clear and complete presentation of the several propositions, advanced by the litigants, and of the merits of the case, I find it most convenient to copy the larger portion of the master's report, which is as follows:

The petition in this case is the beginning of an independent suit or proceeding, in which the finding of fact in the commission's report is made prima facie evidence of the matters therein stated; and although, under said act, "formal pleadings" may be dispensed with, the court must hear and determine the cause "upon proper pleadings and proofs." The court will not grant any relief not prayed or not within the issues. This is a sui generis proceeding, but the fundamental rules of pleading and practice which govern all proceedings in any court apply to it. Kentucky & I. Bridge Co. v. Louisville & N. R. Co., 37 Fed. 567–614; Interstate Commerce Commission v. Lehigh Val. R. Co., 49 Fed. 177; Interstate Commerce Commission v. Atchison, T. & S. F. R. Co., 50 Fed. 295; Interstate Commerce Commission v. Cincinnati, N. O. & T. P. Ry. Co., 56 Fed. 925 (affirmed in 162 U. S. 184, 16 Sup. Ct. 700); Shinkle, Wilson & Kreis Co. v. Louisville & N. R. Co., 62 Fed. 690, 693; Interstate Commerce Commission v. Cincinnati, N. O. & T. P. R. Co., 64 Fed. 981, 983; and other cases, last, but not least, Cincinnati, N. O. & T. P. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700; Texas & P. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 197, 16 Sup. Ct. 666,—the last two cases being called respectively the "Social Circle Case" and the "Import Rate Case."

Before examining the pleadings and proofs in this case, let us consider some preliminary points and objections made by respondents. They contend: "(1) That the statute giving the commission, or any company or persons inter-

ested, the right to bring a proceeding to enforce an order of the commission, and customarily, as the cases reported in the courts show, the commission having brought a proceeding in its own name to enforce its own orders, the fact that it has not done so in this case raises a presumption that the commission itself does not consider that its order is being violated." Counsel do not press this point, but we think it worth mentioning. * * * It will be observed by reference to the act that the resort to this court is in the case of the violation of or neglect or refusal to obey or perform a lawful order or requirement of the commission.

Respondents contend: "(2) That the so-called 'order of the commission,' above recited, especially in its first paragraph, is no order at all, within the meaning of the law, capable of enforcement, but only a rule or principle of law, expressly leaving it open for further investigation before the commission to determine what merchandise and what tariffs might fall from time to time within the rule or outside of it." Without any authority on the subject, it would seem that an order that was to be obeyed or enforced should be definite, complete, and perfect, and easily understood. Says the supreme court: "If the commission, instead of confining its action to redressing, on complaint made by some particular person, firm, corporation, or locality, some specific disregard by common carriers of provisions of the act, proposes to promulgate general orders, which thereby become rules of action to the carrying companies, the spirit and letter of the act require that such orders should have in view the purpose of promoting and facilitating commerce, and the welfare of all to be affected, as well the carriers as the traders and consumers of the country. It may be said that it would be impossible for the commission to frame a general order if it were necessary to enter upon so wide a field of investigation, and if all interests that are liable to be affected were to be considered. This criticism, if well founded, would go to show that such orders are instances of general legislation, requiring an exercise of the lawmaking power." And in another part of the opinion it says: "Congress has not seen fit to grant legislative powers to the commission." Texas Ry. Co. v. Interstate Commerce Commission, 162 U. S. 197, 234, 216, 16 Sup. Ct. 666, 681, 674.

But respondents do not complain of this order for being too general only, but for being imperfect and incomplete, and so, in its present form, incapable of enforcement. The commission found that competition actually existed at the Pacific coast which justified lower rates from Eastern terminals to the coast than to Spokane; but it declined to decide what merchandise was subject to such competition, and what was not, affirming the general principle only that, where competition by water or rail does exist, the respondent may meet it, and reserving the other questions for future inquiry by the commission, and for the making by the commission of such correcting orders as the facts may require. The commission itself, then, seems to have considered its general rule or order as incomplete and unfit for immediate enforcement. According to the commission, facts which it does not find would have to be found by it and other roads would have to be brought in to make its order effectual and enforceable, at least outside of this circuit; and the decisions of the courts confirm the opinion of the commission. The supreme court, in Texas & P. Ry. Co. v. Interstate Commerce Commission, supra, on appeal from the circuit court of appeals, holds, in substance, that the defendant was entitled to have all the circumstances and conditions upon which a legitimate order could be founded, and which could be properly considered, passed upon in the first instance by the commission; and if the circuit court of appeals were of opinion that the commission erred in excluding ocean competition, or any other material fact or facts, from consideration, it should have reversed the decree, set aside the commission's order, and remanded the cause to the commission, to be proceeded in according to law. It says: "If the circuit court of appeals were of opinion that the commission, in making its order, had misconceived the extent of its power, and if the circuit court had erred in affirming the validity of an order made under such misconception, the duty of the circuit court of appeals was to reverse the decree, set aside the order, and remand the cause to the commission, in order that it might, if it saw fit, proceed therein according to law. The defendant was

entitled to have its defense considered, in the first instance, at least, by the commission, upon a full consideration of all the circumstances and conditions upon which a legitimate order could be founded. The questions whether certain charges were reasonable or otherwise, whether certain discriminations were due or undue, were questions of fact, to be passed upon by the commission in the light of all facts duly alleged and supported by competent evidence; and it did not comport with the true scheme of the statute that the circuit court of appeals (or, perhaps, the circuit court) should undertake of its own motion to find and pass upon such questions of fact in a case in the position in which the present one was. We do not, of course, mean to imply that the commission may not directly institute proceedings in a circuit court of the United States charging a common carrier with disregard of provisions of the act, and that thus it may become the duty of the court to try the case in the first instance. Nor can it be denied that, even when a petition is filed by the commission for the purpose of enforcing an order of its own, the court is authorized to 'hear and determine the matter as a court of equity,' which necessarily implies that the court is not concluded by the findings or conclusions of the commission; yet as the act provides that, on such hearing, the findings of fact in the report of said commission shall be prima facie evidence of the matters therein stated, we think it plain that if in such a case the commission has failed, in its proceeding, to give notice to the alleged offender, or has unduly restricted its inquiries, upon a mistaken view of the law, the court ought not to accept the findings of the commission as a legal basis for its own action, but should either inquire into the facts on its own account (with a view to enforce or refuse to enforce the order of the commission), or send the case back to the commission to be lawfully proceeded in." 162 U. S. 197, 238, 239, 16 Sup. Ct. 666, 682. Again, the supreme court, in another case, after condemning the withholding of the larger part of the evidence from the commission, and first adducing it in the circuit court, says: "The commission is an administrative board, and the courts are only to be resorted to when the commission prefers to enforce the provisions of the statute by a direct proceeding in the court, or when the orders of the commission have been disregarded. The theory of the act evidently is, as shown by the provision, that the findings of the commission shall be regarded as prima facie evidence that the facts of the case are to be disclosed before the commission. We do not mean, of course, that either party, in a trial in the court, is to be restricted to the evidence that was before the commission, but that the purposes of the act call for a full inquiry by the commission into all the circumstances and conditions pertinent to the questions involved." Cincinnati, N. O. & T. P. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 184, 196, 16 Sup. Ct. 700, 705.

It seems, then, that although the commission might bring in this court a direct proceeding to enforce the law, in this proceeding the court, although not concluded by the findings or conclusions of the commission, but at liberty to pursue all needful inquiries and investigations "to enable it to form a just judgment in the matter of such petition," can only enforce or refuse to enforce an order of the commission. The court can investigate all it sees fit and necessary to determine whether to enforce or to refuse to enforce the order of the commission, but it cannot change or modify the order sought to be enforced. The commission may finish its order when it will, but, until definite and complete, it cannot be enforced; for this court is limited in its power and jurisdiction in this proceeding to the enforcement or refusal to enforce the order of the commission, as a whole or in part, just as made by the commission. It cannot enlarge, modify, or change it so as to make it enforceable, and then enforce it. This present order, also, is a permissive, and not a prohibitory, one, and therefore incapable of enforcement. The court, in its power and jurisdiction over the matter, is limited to an approval or disapproval, and to the enforcement or refusal to enforce the order of the commission as a whole or in part just as made by the commission; and the court is without power or authority to treat the case as one originally instituted in this court, and make an order or decree of its own, or to modify the order of the commission for the purpose of making it conform to the opinion of the court, "although * * * the court, of course, may go fully

into the proofs on its own examination to determine whether it will approve the order, and may hear any additional proof adduced." Interstate Commerce Commission v. Louisville & N. R. Co., 73 Fed. 409, 413. The circuit court of appeals for the Sixth circuit, in a very careful opinion by Judge Hammond, concurred in by the rest of the bench, speaks to the same tenor and effect: "From what has been already ruled, it is apparent that even if the commission has established, by its inquiry, an abuse to be remedied, the order it gave was not a proper one, and should not be enforced. Large as its powers may be, and plenary as may be the authority of the court to enforce, by mandatory injunctions or otherwise, obedience to its orders, its powers are those of regulation, and not construction or reconstruction. Interstate Commerce Commission v. Baltimore & O. R. Co., 43 Fed. 37–50, 145 U. S. 263, and 12 Sup. Ct. 844. And now see Cincinnati, N. O. & T. P. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700. This is, as the commission has made it, a dispute about discriminating rates; and the easy remedy, on such a complaint, is a readjustment of the rates to cover the discrepancy. As was said in one of the cases we have cited, the method of redress by readjusting the rates must always be left to the choice of the company, at least in the first instance; and in the subsequent St. Louis case, supra, the commission adopted that course, and made the proper order. Here was an arbitrary and peremptory order to abandon the accessorial cartage at Grand Rapids, without regard to any rates, or without option as to readjustment of them, the defendant company not even being allowed the alternative of establishing a like service at Ionia. It is in its nature, not a regulation of commerce, so much as an interference with the rights of property and its use, which possibly even congress could not in this way prohibit. At all events, it is an attempted exercise of a legislative power, which congress has not, we think, conferred upon the commission. Northern Pac. R. Co. v. Washington Territory, 12 Sup. Ct. 283. Nor was there any power in the circuit court to modify or change the order of the commission. Whatever may be the plenary power of a court of equity to command, at the suit of those who are injured, the performance of any duty arising out of a contract or statutory obligation, the jurisdiction it was exercising here is strictly special and statutory, and is limited, as all special jurisdiction is, to the precise power conferred by the interstate commerce act, which is only to compel obedience to the 'lawful order' of the commission. It has not been granted any broader power to exercise the authority of the commission itself by substituting a new regulation or order of its own, or modifying that which the commission has given. It is purely an auxiliary jurisdiction. Interstate Commerce Commission v. Delaware, L. & W. R. Co., 64 Fed. 723. The ordinary jurisdiction of the courts is open to any one injured, to invoke their more plenary powers, except so far as that of an action at law for damages has been made optional with the cumulative statutory remedy by section 9 of the act. The remedy by bill in equity has not been so restricted, and is yet available; but here, the powers of a commission being administrative, and not judicial, the ancillary and supplemental judicial jurisdiction is necessarily limited to the purpose of its creation, and can go no further than to grant or refuse compulsory obedience to the lawful orders of the commission, and as it makes them,"—citing many cases. Detroit, G. H. & M. Ry. Co. v. Interstate Commerce Commission, 21 C. C. A. 140, 74 Fed. 840, 841.

Counsel for petitioners maintains that there is no indefiniteness or uncertainty in this order; that, although the commission did not determine and specify what was and what was not competitive business, "that is certain which can be made certain. In our order all articles carried in class are comprehended. Look at the class, and the order is certain." Respondent shows by testimony and exhibits that class as well as commodity rates are now affected by water competition, which it is expressly permitted by this order to meet, which throws us and the order back upon the question, what articles are and what are not subject to water competition? As to the necessity of bringing in other carriers, the supreme court, in Texas & P. Ry. Co. v. Interstate Commerce Commission, so much quoted in this report, holds that, in proceeding against a carrier of interstate commerce to enforce an order of the commission, another carrier concerned with the defendant in jointly

making the forbidden rate is a proper, but not a necessary, party defendant. "Another objection urged is that as the order of the commission involves rates participated in by the Southern Pacific Company, as owner of a portion of the line over which the through freight is carried, that company was a necessary party. Undoubtedly, that company would have been a proper party, but we agree with the circuit court in thinking that it was not a necessary one." 162 U. S. 197, 205, 16 Sup. Ct. 666, 669, 670, affirming Interstate Commerce Commission v. Texas & P. Ry. Co., 6 C. C. A. 653, 57 Fed. 948, and 52 Fed. 187. See, also, Interstate Commerce Commission v. Southern Pac. Co., 74 Fed. 42, 43.

Again, respondents contend: "(3) That this order sought to be enforced in this proceeding is in its third and principal paragraph invalid and unlawful, in that it attempts to do what neither the commission nor even the court in this case (for the court can in this proceeding only enforce the lawful order of the commission) has power to do, viz. to fix freight rates to Spokane." The supreme court, in Cincinnati, N. O. & T. P. Ry. Co. v. Interstate Commerce Commission, supra (known as the "Social Circle Case"), denies power in the commission to fix rates, and, according to Interstate Commerce Commission v. Louisville & N. R. Co., 73 Fed. 409, 429, "puts that question at rest." It says: "Whether congress intended to confer upon the interstate commerce commission the power to itself fix rates was mooted in the courts below, and is discussed in the briefs of counsel. We do not find any provision of the act that expressly or by necessary implication confers such a power." The supreme court then proceeds to adopt the view expressed by the late Justice Jackson, when circuit judge, in Interstate Commerce Commission v. Baltimore & O. R. Co., 43 Fed. 37, affirmed in 145 U. S. 263, 12 Sup. Ct. 844, and cited with approval in many cases since: "Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at the common law,—free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are regarded as sound, and adopted in other trades and pursuits." 162 U. S. 184, 197, 16 Sup. Ct. 700, 705. And not only has the commission no power to fix maximum rates, neither has it any power to fix minimum, relative, or any rates. "The commission has no power to make rates, and especially has the commission no power to order that rates from a given point to one city shall bear a certain relation to the rates from the same point to another city." Ninth headnote, approved by the judge, Interstate Commerce Commission v. Louisville & N. R. Co., 73 Fed. 409, 410, 428, 429. In Interstate Commerce Commission v. Northeastern R. Co., 74 Fed. 70, 73, the court, after citing the Social Circle Case, says: "The court can only enforce the lawful orders of the commission. As has been seen, the commission is not warranted by the act of congress to fix rates, and to this extent its order is not lawful. The bill [to enforce the orders of the commission] is dismissed." To the same effect is Interstate Commerce Commission v. Alabama Midland Ry. Co., 21 C. C. A. 51, 74 Fed. 715, affirming 69 Fed. 227. In Interstate Commerce Commission v. Lehigh Val. R. Co., 74 Fed. 784, 788, the court, after quoting with approval Justice Jackson's views, adopted by the supreme court, says: "These views of the supreme court decisively show that the interstate commerce commission is not clothed with the power to fix rates which it undertook to exercise in this case. The petition of the interstate commerce commission must be dismissed." This was a sort of percentage case. The first headnote reads: "The fact that the cost of carriage of all coal upon an entire railroad system, from all points of shipment to all destinations, is a certain per cent. of the gross receipts from all coal, is no reason for concluding that upon a particular line or part of the system the cost of carriage bears the same ratio to the coal receipts of that particular line or part."

It follows from these decisions that the interstate commerce commission cannot fix any rate absolutely or relatively, directly or indirectly, by a per-

centage on some other rate or otherwise, but must content itself with pronouncing a rate unjust or unreasonable, leaving the carrier to readjust its rates as often as required so to do. In the case at bar, if it were not for competition found, and found controlling, the commission could have directed the respondents to cease charging a greater rate to Spokane than they might charge to the Pacific terminals·on any kind of merchandise, but it should not have attempted to fix any rate, either absolutely or by reference to any other; for, as counsel for the petitioners suggests, "that is certain which can be made certain," and the commission is not empowered to fix any certain rate. We think these cases a sufficient answer to the contentions of counsel for the petitioners under this head.

·Respondents also contend: "(4) That the circumstances and conditions upon which the commission passed have so changed with the lapse of time and advance of civilization and commerce that this order, lawful when promulgated, is unlawful and unenforceable now." The circumstances and conditions passed upon by the commission were those existing on and before June 4, 1891, when the evidence before it closed. The circumstances and conditions now before the court are those in existence from June to September, 1896, during which time this testimony has been taken. Therefore, says respondent, this court is now asked to enforce a finding and order necessarily temporary in its nature, notwithstanding the extensive changes in circumstances and conditions during five years, which make this case a very different one from that passed on by the commission. In the strong language of counsel: "If the controlling and essential facts are so changed that the case [before the court] is not the same case as the commission made its order upon, the court has no recourse but to remit the complainant to the commission, to have the new facts and circumstances passed upon by that body." The cases already cited under the two previous heads apply to this objection. A case in which the order of the commission is improper or illegal will, under these authorities, be remitted to the commission for further investigation, findings, and orders.

·Counsel for the petitioners insists that, in this objection, respondent seeks to take advantage of its own wrong and the petitioners' long suffering. It denies any material change in circumstances, and alleges that the power to change conditions is to some extent in the hands of respondent itself; and, lastly, that, if any radical change in circumstances and conditions has taken place affecting respondent, it should apply to the commission for a modification of this order, instead of continuing its disobedience or neglect of the order. In Interstate Commerce Commission v. Louisville & N. R. Co., the court says: "An objection is made to the form of the order, in that it is made in terms to operate indefinitely in the future, without any reservation of the power of change or modification, such as changes in traffic conditions might make absolutely necessary. It is argued that, if the order of the commission were made the judgment of this court, it would become a bar to any change in the future. I cannot, however, concur in this view. The order of the commission is essentially an administrative one, and is not final or conclusive in the sense of a court judgment or decree; and the order of this court is one merely to give effect to the order made by the commission, and does not change its character or make it a final judgment. There are no private vested rights in the order of the commission, or that of this court, such as exist in a regular judgment or decree of this court. And, if necessity should arise for a change in the tariff of rates, no reason is perceived why the carrier might not make this on notice to the commission under the act of congress, just as such carrier is permitted to do in regard to the published rates filed with the commission." 73 Fed. 428. According to this, a change in circumstances would not invalidate the order of the commission, but would justify the carrier, on notice to the commission, under the act of congress, in changing its rates without any modification of the commission's order.

If these last three objections are well taken, and the first and third paragraphs of the order are, at the time enforcement is sought, unlawful (and the second paragraph, as we shall see later on, is not involved in this case), the court will be compelled to dismiss this case. In spite of the contention of counsel, we do not think these questions proper to be passed upon by the

master. They address themselves rather to the court, and the court necessarily, if only inferentially and preliminarily, overruled them, as far, at least, as the master is concerned, in its order of reference. Having thus, as far as we are concerned, disposed of these preliminary objections, and endeavored to report fairly, not only the contentions, but even the authorities found, on both sides, we come to the consideration of the pleadings and proofs in this case.

Omitting many immaterial matters, the pecuniary interest of the petitioners in the subject-matter of the petition, and the investigation and order of the interstate commerce commission in the Merchants' Union of Spokane Falls against the Northern Pacific Railroad Company et al., in 1891, are admitted in the pleadings. The petition gives what it claims to be a history of freight rates prior to the hearing by the interstate commerce commission, and alleges that the rule by which the traffic managers of the Northern Pacific Railroad made their freight rates on articles on merchandise from Eastern terminals to Spokane was the through rate to Western terminals plus the local rate back to Spokane. It then alleges that this order of the interstate commerce commission was made to apply to the Union Pacific Railroad as well as to the Northern Pacific Railroad, "but that neither of said roads has attempted to comply with the order of the said commission, but that the discriminations practiced against Spokane, with some few exceptions, have been continued by the management of said roads as well since the said order as before." The petition then gives what it calls a "partial list, by way of illustration," of the articles of merchandise upon which the management of these roads continues to discriminate against Spokane, and in favor of Western terminal points, and showing the extent of that discrimination, many of which articles, it avers, do not at all come to Western terminals by water, and, upon such as do, the discrimination practiced against Spokane by the railroads, considering the service necessary to lay them down by rail at the respective points, is very great. Then follows another "partial list" of articles of merchandise, which, according to the petition, "are confessedly not susceptible of water transportation, and which shows the relative rate maintained by the railroad companies to Spokane and to Western terminal points." The petition continues: "It will be seen from the above that the said railroad companies have treated the order of the interstate commerce commission with contempt, and that they utterly failed to readjust their rates so as to charge Spokane only eighty-two per cent. of the rate maintained on such articles to terminal points." The prayer of the petition is for an investigation by the court of the matter of freight rates to Spokane, and that its receivers be required to so adjust the same that they will be relatively and within themselves reasonable, and that no greater charge be permitted to Spokane from Eastern terminals than is made from Eastern terminals to Western terminals, except on such articles as are truly subject to water competition, and that said receivers be required to comply in letter and spirit with the findings and order of the interstate commerce commission, hereinbefore referred to, et cetera. All the allegations of the petition, with the exceptions mentioned, are denied in the answer. The appointment of, and that the Northern Pacific Railroad was in the hands of, receivers at the time the petition herein was filed, and during the taking of testimony thereunder, is admitted by their appearance and answer. The allegation that neither the Northern Pacific Railroad nor the Union Pacific Railroad has attempted to comply with the order of the said commission cannot of itself make the Union Pacific Railroad a party to this proceeding, and the Union Pacific Railroad is not, as far as the master is aware, a party hereto.

From this examination of the petition it will be seen that it directly and specifically charges the respondent with only one violation of the order of the interstate commerce commission, viz. that on articles not subject to water competition respondent charges shippers in Spokane more than 82 per cent. of its rates on such articles to Western terminals. and, inferentially, historically, and argumentatively, that respondent discriminates against Spokane, and in favor of Western terminals, in all articles of merchandise, and that its through rates to Spokane are unreasonable. Of course, in this proceeding only the allegations of violation of the order of the interstate commerce commission are material. There is no complaint of the rates from the coast back to Spokane, nor

83 F.—17

of any local rates out of Spokane, nor of any local rates from points between Spokane and the Eastern terminals; nor is there any allegation of discrimination against Spokane in the matter of car-load rates, mixed car-load lots at car-load rates, minimum weight of shipments entitled to car-load rates, etc.; nor is it alleged that the respondent does not furnish, provide, and allow the same privileges, facilities, and advantages on shipments to Spokane as are or may be at any time furnished, provided, or allowed on like shipments to Portland or other Pacific terminals. Complaint is not made of the reasonableness of the Spokane rates considered by themselves, but of alleged discrimination against Spokane as compared with Seattle, Tacoma,, and Portland, seaboard cities, the termini on the coast of the Northern Pacific Railroad. Petitioners do not allege that the rates of the Northern Pacific Railroad return it too much revenue. The aggregate of its income is not said to be too large; nor is any rate challenged as too high, except by comparison. The complaint is against the low rates to the coast, or against the existing comparison of rates which is claimed to give the seaboard cities an undue and unreasonable advantage. The relief which petitioners ask would be granted them either by raising rates to the coast or by lowering them to Spokane. Counsel for petitioners, in his brief, says: "Besides, as I have pointed out again and again, this is a question of relative rates more than absolute rates. * * *" The interstate commerce commission, by its order, did not determine that the commodity rates then prevailing to the coast were unreasonable, and although the commission found (5 Interst. Commerce Com. R. 489), that the commodity rates to coast terminal points were very numerous, covering over 50 pages of the printed tariffs then in existence, yet there was neither any finding nor any order that any single one of those commodity rates was unwarranted by the circumstances and conditions prevailing at the coast, or in any manner unfair to Spokane or its merchants. On the contrary, by the terms of the first paragraph of .the order cited, after finding that these commodity rates already exist in large numbers, express permission is given to the carrier to make commodity rates on competitive traffic; but the commission left it, by the terms of this order, to the carrier to fix the rates not lower than necessary, from time to time, to meet such competition, nor in any case on articles not actually subject thereto. Now, if this is an order which can be enforced in any such proceeding as this,. when complaint is made that the order is violated so far as these commodity rates are concerned, it must appear that the carrier has either made a commodity rate which was lower than necessary, from time to time, to meet the water competition, or that such a rate was applied to an article not actually subject thereto; and it lies upon the party complaining of a violation of the order to allege and show affirmatively that a rate is made which is lower than necessary to meet the competition, or upon some article or articles which are not affected by such competition. The necessity of allegation and the burden of proof are upon the party complaining. Interstate Commerce Commission v. Louisville & N. R. Co., 73 Fed. 409, 410, headnote 12, and whole case; Interstate Commerce Commission v. Baltimore & O. R. Co., 43 Fed. 37, headnote 2; Texas & P. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 197, 238, 16 Sup. Ct. 666. We have seen how the burden of allegation was borne. How was the burden of proof borne? Petitioners in putting in their proof, introduced—First, the report of the interstate commerce commission; second, they introduced the tariffs; and, third, they put witnesses on the stand who testified that they were engaged in business at Spokane, and that the rates to coast terminals were less than the rates charged to Spokane, although the coast terminals were upward of 400 miles further west, and that, by reason of this. they suffered in their ability to compete in various markets with merchants at coast terminals. They showed that there was a discrimination against Spokane. Did they show that that discrimination was unjust, or that on any of the articles mentioned by them there was want of water competition?

We have thus dwelt upon the pleadings in this matter because we thought that the court might feel bound by them. Counsel, if we understand them, do not desire to take any advantage of informalities, perhaps. even of defects in pleadings. We come now to the real questions or issues made or intended to be made in this case: Are respondent's rates from Eastern terminals to Western terminals lower than are necessary, from time to time, to meet the compe-

tition of carriers not subject to the act to regulate commerce, or allowed on articles not actually subject to such competition? Are the through rates from Eastern terminals to Spokane, either absolutely or relatively, unreasonable, and do they materially exceed 82 per cent. of the class rates on articles not subject to such competition at the time of the decision and order of the interstate commerce commission, applied both to Spokane and the Pacific terminals? Whether rates that are allowed to meet competition are lower than necessary to meet it depends, of course, upon the character and amount of competition, and the rulings of the court in this regard. All the cases upon this branch of the subject, as well as Interstate Commerce Commission v. Cincinnati, N. O. & T. P. Ry. Co., 56 Fed. 925, 928, affirmed in 162 U. S. 184, 16 Sup. Ct. 700, hold that "competition, the life of trade, cuts an important figure, and cannot well be overlooked or denied"; that a "common carrier cannot be required to ignore or overcome existing differences in transportation facilities of different localities, created, not by its own arbitrary action, but by nature or by enterprise beyond its control,"—citing Interstate Commerce Commission v. Atchison, T. & S. F. R. Co., 50 Fed. 295, 306. Judge Ross, in the case just cited, cites with approval Judge Deady in Ex parte Koehler, 31 Fed. 315, 319: "The power of a corporation to make a rate is limited by the necessities of the situation. Competition controls the charge. It must take what it can get, or, as was said in Ex parte Koehler (a previous case), abandon the field, and let its road go to rust." Judge Ross adds. "But, San Bernardino [in this case Spokane] not being a competitive point, it does not get the terminal rates. The proof shows, what is also a matter of common knowledge, that railroads do not make terminal rates unless compelled to do so by competition. Wherever and whenever actual competition exists, the question the carrier has to deal with is not so much what is a fair rate for the service, or what the traffic will bear, but what rate can be got for the service as against the rate offered by the competitor. Especially is this true when the competitor is a carrier by water, because that is the cheapest known kind of transportation, and is unrestricted by law."

Even the interstate commerce commission, in the case in which the order involved in this proceeding was made, says: "They [the railroads] had the alternative of making rates which would attract the business, or leaving it mainly to the ocean carriers;" and, again, on page 498: "The water carriers solicit traffic for transportation from the Atlantic seaboard to Pacific terminals at a cost to the shipper greatly below the commodity rates of these defendants." 5 Interst. Commerce Com. R. 497, 498. As to effect of competition, see, also, Interstate Commerce Commission v. Louisville & N. R. Co., 73 Fed. 409–424, which holds that the question of mileage (or length of haul) is by no means controlling or the most important where difference of rates is complained of. In McClelen v. Railway Co. (decided June 6, 1896) 6 Interst. Commerce Com. R. 588, the commission held that what is forbidden by the fourth section of the act to regulate commerce is only a form of unjust discrimination or undue preference. So, it appears that reasonableness and justice are the sole requirements of the law upon the subject of rates. See, also, the leading case, Kentucky & I. B. Co. v. Louisville & N. R. Co., supra, and the Import Rate Case. This makes all the cases on the subject of rates equally applicable to any case under any section of the act involving the question of rates, and any cases that we may cite under this first head will apply as well to our other points. Mr. Justice Brown, in 145 U. S. 263, 12 Sup. Ct. 844, after adopting Judge Jackson's views in Interstate Commerce Commission v. Baltimore & O. R. Co., about the rights of carriers, already quoted, says: "It is not all discriminations or preferences that fall within the inhibition of the statute; only such as are unjust and unreasonable." And this language, as well as Judge (afterwards Justice) Jackson's, is also approved and adopted in the Social Circle Case and other cases. The words "'undue or unreasonable preference or advantage,' * * * in the * * * act to regulate commerce, plainly imply that every preference or advantage is not condemned, but such only as are undue or unreasonable." Headnote 7, Interstate Commerce Commission v. Alabama Midland Ry. Co., 69 Fed. 227, affirmed in 21 C. C. A. 51, 74 Fed. 715, 716. The much-cited Social Circle Case and the Import Rate Case confirm these cases, and the first holds that "the very terms of the statute that charges must be reasonable, that discrimina-

tion must not be unjust, and that preference or advantage to any particular person, firm, corporation, or locality must not be undue or unreasonable, necessarily implies that strict uniformity is not to be enforced. * * * The mere circumstance that there is in a given case a preference or an advantage does not of itself show that such preference or advantage is undue or unreasonable, within the meaning of the act." This case also holds that every circumstance which would have any weight as bearing upon the fixing of rates must be considered (see, also, Interstate Commerce Commission v. Louisville & N. R. Co., 73 Fed. 420), and that these matters must be looked at as carriers look at them; and "the mere fact that the disparity between the through and the local rates was considerable did not of itself warrant the court in finding that such disparity constituted an undue discrimination." 162 U. S. 197, 219, 239, 16 Sup. Ct. 666, 675, 683.

The interstate commerce commission found in the Spokane Freight Rate Case that these low terminal rates afford a margin of profit over the actual cost of moving the traffic (which is the inside limit of a lawful rate), but would be ruinous to the company if applied even to intermediate stations (5 Interst. Commerce Com. R. 500); and in another case the commission found that a railroad ought not to neglect any traffic of a kind that would increase its receipts more than its expenses, etc. In re Louisville & N. R. Co., 1 Interst. Commerce Com. R. 79. Soulless (so called) corporations are not generally accused or even suspected of charging less than they ought to charge for any service. It is the interest of the carrier to get all he can from terminal or other business. "It must be stated, too, that questions of this kind must be treated broadly and practically. The carrier's business is one which involves so many considerations, and the necessity of taking into account so many conditions, that questions of this kind do not admit of any rigidly theoretical rules in their solution. * * * [An English case is then cited with approval.] The conclusion is one of fact to be arrived at by looking at the matter broadly, and applying common sense to the facts that are proved. * * * It is impossible to exercise a jurisdiction such as is conferred by this section by any process or mere mathematical or arithmetical calculation. Where you have a variety of circumstances differing in the two cases, you cannot say that such a difference of circumstances represents or is equivalent to such a fraction of a penny difference of charge in the one case as compared with the other. A much broader view must be taken, and it would be hopeless to seek to decide a case by any attempted calculation. [Citing another English case; and, according to Interstate Commerce Commission v. Baltimore & O. R. Co., 43' Fed. 37, 51, affirmed in 145 U. S. 263, 284, 12 Sup. Ct. 844, the interstate commerce act having adopted substantially some of the provisions of the English railway traffic acts, the construction given to such provisions by the English courts must be regarded as incorporated into the act.] The other alternative would be to raise the shipping [terminal] rates to the level of the local rates. These shipping [terminal] rates are charged upon traffic of a highly competitive character, and we may take it that they are fixed at the highest point that is consistent with securing a remunerative share of the traffic. I am not introducing competition to justify the preferences, but only as a factor in the result which, it seems to me, will inevitably follow upon the raising of the Southampton dock [terminal] rates, viz. the loss of the whole shipping traffic to the railway. A slight increase would probably have this effect; any approximation to the level of the local rates most certainly so. * * *" Interstate Commerce Commission v. Louisville & N. R. Co., 73 Fed. 409, 419, 421, 423, 424. See, also, Interstate Commerce Commission v. Alabama Midland Ry. Co., 21 C. C. A. 51, 74 Fed. 715, 721, affirming 69 Fed. 227; Detroit, G. H. & M. Ry. Co. v. Interstate Commerce Commission, 21 C. C. A. 103, 74 Fed. 803, 817; Interstate Commerce Commission v. Cincinnati, N. O. & T. P. Ry. Co., 56 Fed. 925, affirmed in 162 U. S. 184, 16 Sup. Ct. 700. If rates were raised, even the products of the Mississippi valley would go down the river, or way East, to get here by water; or our merchants would buy the same things in the East, so as to get them by water. The supreme court of the United States does not limit the effect of competition—as is attempted to be done by this order of the interstate commerce commission—to that of carriers not subject

to the act to regulate commerce (see case last quoted from, 73 Fed. 409, 418, 419, and 420, and Interstate Commerce Commission v. Baltimore & O. R. Co., 145 U. S. 263, 284, 12 Sup. Ct. 844), but holds that all or any kind of competition changes conditions and circumstances so as to make discriminations and preferences, which would otherwise be unjust and unreasonable, lawful and proper. The courts in some of the early cases under the interstate commerce act did not deem it their duty to consider the rights and interests of the carriers. They now construe the act so as to treat carriers, as well as shippers, consignees, and everybody concerned, including the public, with evenhanded justice. They allow party-rate tickets (Interstate Commerce Commission v. Baltimore & O. R. Co., affirmed by the supreme court, supra); a difference in summer and winter rates (interstate Commerce Commission v. Louisville & N. R. Co., supra); and, generally speaking, whatever rates competition or other circumstances over which the railroads have no control may render necessary.

Counsel for petitioners contends that, if the rate forced on the company secures the business, it must be lower than necessary to do this. This is certainly a non sequitur. That it secures the business shows that the company had met the competition which it had a right to meet,—not that it had more than met it, and thrown away income to which it was entitled; and rates that commerce did not avail itself of would be mere paper rates, and absolutely useless. The question whether terminal rates are allowed on articles not actually subject to water competition involves the question what articles are, and what are not, subject to such competition. Counsel for petitioners insists that this is the only point to be determined here, and maintains that, because now almost all articles come to the coast by rail, therefore they are not affected by water competition. Is not this substantially the same non sequitur already pointed out? The interstate commerce commission, in San Bernardino Board of Trade v. Atchison, T & S. F. R. Co., 4 Interst. Commerce Com. R. 104, held that such competition must be actual, not merely possible; but the commission, in a subsequent case (Raworth v. Northern Pac. R. Co., 5 Interst. Commerce Com. R. 234), holds that, perhaps, "a clear case of competition, not strictly speaking actual, but having a potential existence, would be sufficient. Competition has a potential existence * * * where the means of such competition exist, and all the conditions are such that it is morally certain an advance in rates by a carrier will result in developing competition of controlling force. If the facts make out a clear case of this kind, it would seem unreasonable to require the carrier to go further, and demonstrate by an actual advance in rates, resulting in a loss for the time being of the traffic involved, that such advance will so result." Is there any necessary contradiction between actual and potential? Cannot competition be both potential and actual at one and the same time, and very potential, too, in another sense of the word? The circuit court of appeals, in Interstate Commerce Commission v. Alabama Midland Ry. Co., 21 C. C. A. 58, 74 Fed. 715, 717, 723, says: "The Alabama river, open all the year, is capable, if need be, of bearing to Mobile, on the sea, the burden of all the goods of every class that pass to or from Montgomery. * * * When the rates to Montgomery were higher a few years ago than now, actual active water-line competition by the river came in, and the rates were reduced to the level of the lowest practical paying water rates; and the volume of carriage by the river is now comparatively small, but the controlling power of that water line remains in full force, and must ever remain in full force as long as the river remains navigable to its present capacity. * * * The volume of trade to be competed for, the number of carriers actually actively competing for it, a constantly open river to take a large part of it whenever the railroad rates rise up to the mark of profitable water carriage, seem to us, as they did to the circuit court, to constitute circumstances and conditions at Montgomery substantially dissimilar from those existing at Troy, and to relieve the carriers from the charges preferred against them by its board of trade."

The respondent having shown potential competition, that the means of such competition exist, and that that character of transportation is practicable, is it

necessary for it to show the actual carriage of the goods? A carrier cannot be required to make a separate rate for each separate article, or to take an article out of the class to which it belongs, and put it back again, whenever, according to hearsay, its rivals get or lose the carriage of a small quantity of it. To attempt this would introduce endless detail and confusion in tariffs, and would not be practicable or feasible; for, as similar things generally come packed together, to enforce such a distinction, the carrier would be compelled to open and examine every box or package of goods which was offered it. There is certainly a practical necessity, when the bulk of a certain class of goods is subject to water competition, for putting the whole class which naturally belongs together in a tariff based on water competition. The evidence, including bills of lading, ships' manifests, rate sheets, etc., shows that all articles carried by the respondent had actually been carried to the coast by water, or are capable of being so carried, with very few and trifling exceptions. It is more a question of tinning, casing, and packing than anything else. And, since water carriers have adopted railroad tariff classification and rates, the order of the commission allowing the respondent to meet water rates applies as well to class as to commodity rates. Counsel for petitioners admits that the distinction between class and commodity rates is no longer tenable or useful. Speaking of water carriage, he says: "Now, whether this carriage be done under classification or under commodity rates can make no difference, because, as already pointed out, the railroads are entitled, under the order, by the commodity rate, to meet water competition. The right to do this we do not and have not questioned. It is wholly immaterial whether the steamship companies carry now by the class rate rather than by the commodity rate. * * * But whether the water competition was greater or less, in my view of the law in this case, is quite immaterial, because whatever articles the railroad is compelled to carry in competition with water it may carry at a less rate under its commodity sheet, and the only materiality of that question is touching the articles as to which this competition operates. * * *"

The question whether through rates from Eastern terminals to Spokane are relatively reasonable, or not, is involved in, and has been already considered with, the question whether terminal rates to the coast are lower than necessary. If terminal rates are made by competition, and not by the respondent, of course respondent is not responsible for them or for their disparity with other rates, and they can form no basis of comparison with other rates. Are through rates from Eastern terminals to Spokane on all classes of goods in themselves reasonable? The testimony of Mr. Hannaford and Mr. Clough shows that these rates were and are made up like any other rates, by gradual increase with increasing distance from St. Paul, and that only when they exceed the through rate to Western terminals plus the local rate back to Spokane is that combination rate applied. According to Interstate Commerce Commission v. Alabama Midland Ry. Co., 69 Fed. 227, affirmed in 21 C. C. A. 51, 74 Fed. 715, a combination rate is not violative of the act to regulate commerce. The only evidence of unreasonableness of these rates is the disparity between them and coast rates; but this argument falls before the last decision of the supreme court of the United States under this act,—the Import Rate Case, so often referred to: A reasonable rate, according to Reagan v. Trust Co., 154 U. S. 362, 411, 14 Sup. Ct. 1047, is one which provides sufficient revenue to pay operating expenses (including even betterments), taxes, and a fair return on the capital invested. See, also, Southern Pac. Co. v. Board of Railroad Com'rs of California, 78 Fed. 236. If the rate to Spokane were reduced, all the rates back to Eastern terminals would have to be proportionately reduced.

The aggregate tons for the year ending May 31, 1896, shipped from Eastern terminals to Spokane, Seattle, Tacoma, and Portland, and the aggregate earnings thereon, are shown in exhibits to Mr. Taylor's evidence, taken at St. Paul, as follows:

| Destination. | Tons. | Earnings. |
| --- | --- | --- |
| Spokane | 9,437 | $260,087 46 |
| Seattle | 11,831 | 180,908 73 |
| Tacoma | 13,041 | 189,098 17 |
| Portland | 13,184 | 198,225 20 |

The actual rate per ton per mile on Spokane business (which is high class, mostly merchandise) is therefore about 1.8 cents per ton per mile, instead of 3.43 cents, as the commission made it. The average earning of the Northern Pacific Railroad for the year ending June 30, 1895, was, as shown by its report, 1.11 cents per ton per mile. This includes coal, lumber, wheat, flour, and all classes of freight, while the figure for Spokane is based on merchandise. Coal, lumber, wheat, flour, etc., do not move from Eastern terminals to Spokane. Spokane has a lower rate per ton per mile from Eastern terminals than has any intermediate station. The Northern Pacific Railroad has been earning no dividend on its stock, and since 1893 no interest on the bulk of its bonded debt; paying only operating expenses, and a part of its interest. If relief were granted to the petitioners, the Northern Pacific Railroad, instead of reducing rates to Spokane, would be forced to the alternative of raising its coast rates, and abandoning that business to its competitors. This would hurt the company, and not help Spokane.

Respondent's Exhibit 14, St. Paul evidence, shows tonnage for the year ending May 31, 1896, through Eastern terminals, as follows:

|  | Tons. | Earnings. |
|---|---|---|
| To coast | 40.403 | $ 609,674 47 |
| To intermediate points | 313,690 | 3,784,337 06 |

That is, the coast business earns less than one-sixth of the aggregate earnings on business from and through Eastern terminals. Proof was made of the earnings, operating expenses, and other charges of the receivers of the Northern Pacific Railroad for the whole period of the receivership, from August 16, 1893, to May 31, 1896. From this statement it appears that the rates charged and collected—the receivers' net operating income applicable to what are called "fixed charges"—was always insufficient for the purpose, leaving a deficit, to say nothing of any dividend for the stock of the company; and there is no claim made that this road was not economically operated, it being operated by the United States courts, the accounts of receipts and expenses being monthly filed in court for the inspection of all parties in interest. The very fact that this road, like a good many others, was in the hands of receivers, without any charge of bad management on its part, goes to show that its rates could not be reduced. There is no suggestion in the evidence that the management was incompetent, nor does the evidence sustain petitioners' contention that it was swayed by any bias towards Pacific coast terminals, or by any prejudice against Spokane. This case is not the case made before the commission, but a much stronger case for the respondent.

To sum up briefly, before formal findings, the evidence, as we read it, in the light of the authorities, shows: (1) That respondent's rates from Eastern terminals to Western terminals are not lower than necessary, from time to time, to meet the competition encountered at Western terminals, nor allowed on articles not actually subject thereto. (2) That respondent's through rates from Eastern terminals to Spokane are both in themselves and relatively reasonable. This really covers the whole ground, for respondent is not charged with any violation of the second or of the first clause of the third paragraph of the interstate commerce commission's order; and since class, as well as commodity, rates are affected by competition, the distinction and comparison between them in this order is rendered nugatory.

Counsel have requested a good many findings. We shall adopt as many of them as we can. We cannot affirm many of the findings of the interstate commerce commission, as requested by petitioners' counsel, because they contain facts not brought out before us. The completion of the Great Northern Railway, the dissolution of the Transcontinental Association, and other changes in the situation of the respective parties hereto, are noted in our findings, and both past and present rates appear in the tariff sheets in evidence, and need no findings. The tonnage carried to Spokane, Seattle, Tacoma, and Portland during the year ending May 31, 1896, is shown in another part of this report, and may be considered a finding. Counsel for petitioners also requests us to find that there is no water competition upon certain articles (naming them) that, according to the evidence, have come to

this coast by rail; and that there is more or less water competition upon certain other articles (naming them) that have, according to the evidence, come to this coast, sometimes by rail and sometimes by water; and he confesses that, "as to any articles in the tariff sheets concerning which no testimony has been offered, I conclude that there is no water competition," and asks the master to so find. For the reasons already given, and under the decisions of the courts cited, such findings would be untrue, being based on facts insufficient if not immaterial and irrelevant, and the master is therefore compelled to decline to adopt them. As the commission itself says in the Spokane Freight Rate Case: "Special facts relating to particular shipments might be multiplied indefinitely, but their chief value would consist in furnishing instances of ocean (or rail) carriage; while general statements, though leading more directly to correct conclusions, would, doubtless be subject to modifying exceptions." Whether the Northern Pacific Railroad Company would find its account in making cheaper rates to Spokane, because it would thus get not only the original carriage of articles, but also their carriage for distribution; and whether the completion of the Great Northern Railway has diminished the earnings of the Northern Pacific Railroad Company; and whether the president and manager of the Great Northern Railway Company, for a consideration, promised the citizens of Spokane to make any particular rates to Spokane,—do not seem to us very material questions in this proceeding.

### Facts.

(1) Since the date of the report of the interstate commerce commission in the Spokane Freight Rate Case, Spokane has grown in population, trade, and relative importance. It has now a population of about 35,000.

(2) The Union Pacific, Northern Pacific, and Great Northern Railway Companies make common rates to Spokane and Pacific coast terminals. (This is what the circuit court of appeals, in Interstate Commerce Commission v. Alabama Midland Ry. Co., 21 C. C. A. 51, 74 Fed. 715, affirming 69 Fed. 227, calls "a matter of business necessity.")

(3) The haul from Eastern terminals to Pacific coast terminals is something like 400 miles longer than the haul from Eastern terminals to Spokane, and the portion of the road embraced within this 400 miles was more difficult and expensive to build, and is more difficult and expensive to maintain and operate, mile for mile, than the road from Spokane eastward to St. Paul.

(4) Regarding this as a proceeding to enforce the order of the interstate commerce commission, referred to in the petition herein, and the findings of fact of the commission as prima facie correct, it appears that, since the order of the commission became operative, ocean competition to North Pacific coast terminals has increased, not only in volume, but in variety of traffic. At the time of the hearing before the commission, such competition was mainly, if not wholly, by clipper ships from Atlantic coast points. There was little, if any, ocean competition by way of the Panama or Pacific Mail Line, which operated steamships from Atlantic coast points to the Isthmus of Panama, across the Isthmus by rail, and steamships to San Francisco. At that time, respondent, with other transcontinental rail lines, was a member of the Transcontinental Association; and, by or through the association, the business by the Panama Line was carried on in such a way as not to be really competitive with the rail lines. The Panama Line was guarantied certain earnings per year for each of its ships. It was used by the transcontinental lines to carry the class of freight sought after by the clippers, and thus to meet clipper competition.

(5) The line of the Great Northern Railway Company, from St. Paul to Seattle and Puget Sound points, was opened for business in January, 1893. About this time, members of the Transcontinental Association withdrew from it, and it ceased to exist. The Panama Line, called in this proceeding the "Columbian Line," and the Sunset Route, became, after the dissolution of the Transcontinental Association, active competitors from Atlantic coast points to San Francisco and Puget Sound points. By the Sunset Route, traffic is transported from Atlantic coast points to New Orleans or Galveston, and by rail

to San Francisco and Portland. To meet water competition, joint tariff, effective February 15, 1893, was adopted. The articles embraced in the commodity list of this tariff covered the class as to which there was active competition by clipper ships, the Columbian Line and Sunset Route, and the rates to Portland and Puget Sound points were justified by reason of such competition. During the life of the Transcontinental Association the rates to Portland and Puget Sound points were kept on substantially the same basis as to San Francisco. After the association was dissolved, the rates by the Columbian Line were lowered, and it commenced to carry a much higher class and greater variety of traffic. The Sunset Route made rates to meet those of the Columbian Line. By such joint tariff of defendant, the rates were higher than the rates by the Columbian Line and Sunset Route to San Francisco, plus the local from San Francisco to North Pacific coast points. In August, 1894, the Columbian Line published and put into effect a tariff of rates according to Western classification, and certain commodity rates from Atlantic coast points to San Francisco and North Pacific coast points. Later it published a class and commodity tariff to San Francisco. These tariffs and that of respondent, except as to the commodity list, came under what is known as the "Western Classification." The Columbian Line solicited and obtained business under these tariffs, and became an active competitor of respondent, not only as to articles embraced in its commodity tariff, but as to those covered by the Western classification. To meet this competition, actual and potential, respondent adopted and published joint tariff, which became effective February 22, 1896.

(6) The interstate commerce commission did not find as a fact that respondent's commodity rates to the North Pacific coast points, in force when its order became operative, were not justified by ocean competition. Petitioners have not shown that there is not actual and effective water competition covering substantially all the articles embraced in respondent's tariff, effective February 22, 1896, and now in force. There is actual, potential, and controlling water competition, affecting all classes of traffic to North Pacific coast points embraced within the commodity list and classification of respondent's tariff now in force. Since 1893 water competition has increased, not only in volume, but in variety of traffic; and since August, 1894, it has embraced all articles covered by the Western classification and by respondent's tariff now in force. Prior to January 1, 1893, competition was limited to articles embraced in respondent's commodity list.

(7) Under existing rates of the Columbian Line and Sunset Route, and under water competition as it now exists, the effect of any material increase in respondent's class and commodity rates from or through its Eastern terminals to Portland and Puget Sound points would be to practically deprive it of business to those points, except as to perishable freight, certain classes of high-priced goods, and emergency shipments. * * *

(8) Articles sold in the Mississippi Valley and Chicago are largely shipped by rail to North Pacific coast points, because under existing tariffs of respondent, in connection with rail lines from Chicago and Mississippi points, the rates are as low as the rates from such points to Atlantic coast points plus the water rates. Should present rates from Mississippi Valley points and Chicago to North Pacific coast points be materially increased, traffic from such points would be carried by rail to Atlantic coast points, and thence by water to North Pacific coast points. Under existing rates of respondent, taking into account emergency business and the saving of time, traffic to North Pacific coast points from and through Eastern terminals is, to a very great extent, carried by rail. Spokane merchants find it to their advantage to pay the rate to the coast plus the rate from the coast to Spokane, because the combined rate is lower than the class rate to Spokane. Rates to Spokane fixed by the commission as reasonable are: Class 1, $2.90; class 2, $2.46; class 3, $2.05; class 4, $1.64; class 5, $1.44. The combined rate is less, and as stated in respondent's exhibit No. 17, under head of rates from Chicago to Spokane and Tacoma, with locals from Tacoma to Spokane, in effect May 5, 1896. The coast merchants, as a rule, pay car-load rates from the East to the coast, and the less than car-load rates from the coast to interior points of sale and consumption. The Spokane merchant purchases in car-load lots to distribute from Spokane. The coast merchant cannot deliver goods in Spokane as cheaply as the Spokane merchant,

because the local rate from the coast to Spokane in less than car-load lots is much higher than the car-load rate.

(9) Freight in car loads from Eastern terminals to North Pacific coast points is carried principally in cars forming part of trains made up of cars for local points along its line in Minnesota, North Dakota, Montana, and Washington. With its road and equipment, and in view of transpacific business, it is necessary and it is required to haul its cars to Pacific coast points. In view of the manner in which its business is and must be conducted, it is justified in maintaining its existing rates to the coast. Such rates yield an income which would be lost if the rates were materially increased. It is better that it should earn what it can at existing rates than to haul empty cars to the coast or abandon the business.

(10) Should the respondent apply its existing coast rates where they are less than interior rates on business through Eastern terminals to points west of Bismarck, in North Dakota, on the basis of the business of the month of November, 1895, its earnings would be reduced $44,026.03, and for the year $528,312.36. But for water competition, rates to the coast would be higher than they now are, and should be higher than the rate to Spokane.

(11) Existing class rates to Spokane are not unreasonable, nor relatively in excess of rates to any intermediate point. They were made to conform to the order of the commission, and a reduction of class rates to Spokane would enforce a reduction from Eastern terminals to all intermediate points in substantially the same proportion. A reduction of one cent per 100 pounds, through Eastern terminals, to stations on the line between Fargo and Spokane, on the basis of the business for November, 1895, would reduce respondent's earnings $3,375.98, and for twelve months $40,511.76. The business to Spokane is mostly merchandise, and of high class. The average earnings of respondent for the year ending June 30, 1895, were 1.11 cents per ton per mile. The rate per ton to Spokane on the business carried to Spokane was 1.8 cents per ton per mile; the rate to Spokane on high-class merchandise per ton per mile being a little over 7 mills more per ton per mile than the rate on all classes of traffic, of which the lowest is a considerable part. The rate per ton per mile to Spokane is lower than the rate to any intermediate point. The combined rate from Chicago to Spokane, in effect May 5, 1896, is much less than a class rate to Helena, on the line of respondent; Kalispell, on the line of the Great Northern; Winnemucca, on the lines of the Union and Southern Pacific Companies; and The Needles, on the line of the Santa Fé,—the distance from Chicago to those points not varying more than 50 miles from the distance to Spokane. Spokane thus has the benefit of water competition to coast points. A material increase of respondent's rates to coast points would drive it out of the business, largely reduce its earnings, and be of no advantage to Spokane. In that event Spokane would be compelled to pay the existing class rates, or the water rate to Pacific coast points, plus the local rates from such points to Spokane. Respondent's earnings are not in excess of what it is entitled to receive. There is nothing to show that existing rates to Helena, Missoula, Butte, or Kalispell are too high. Whatever disadvantage Spokane is under by reason of competition with coast terminals is the natural result of its geographical location.

And, finally, as conclusions we find:

(1) That competition by carriers subject and not subject to the interstate commerce act exists at the Pacific coast terminals,—Portland, Seattle, and Tacoma,—of controlling force, on all the articles contained in the tariff of the Northern Pacific Railroad.

(2) That no articles are carried to Western terminal points on commodity rates which, if the class rates existing at the time of the order of the interstate commerce commission were imposed, or class rates 18 per cent. higher than the class rates to Spokane were imposed, would still seek rail rather than water transportation.

(3) That the rates from Eastern terminal points to Spokane are reasonable in themselves, and relatively reasonable, on all classes of goods.

And (4) that no violation by the respondent of the order of the interstate commerce commission has been established by the petitioners.

The master has analyzed the pleadings, and shown in his report—First. That the proceeding is founded upon section 16 of the interstate commerce law, and has a specific object, viz. to enforce a decision and order of the interstate commission. Second. In such a proceeding the court has no general power to adjust differences between the litigants, or to correct abuses in the conduct of its business, by a railroad company; and unless a valid order has been made by the interstate commerce commission, and violated by the railroad company, no relief can be granted to the petitioners. Third. The interstate commerce commission is not authorized to fix rates either absolutely or relatively, and, where the commission has assumed to make an order fixing rates for the carriage of merchandise by railroads to a designated point, it is the duty of the court to declare such order to be null and void. Fourth. The order of the interstate commerce commission in the case of the Merchants' Union of Spokane Falls against the Northern Pacific Railroad Company and the Union Pacific Railway Company is in part a mere general declaration of the duty of the defendant corporations, as defined by the law itself, and in part prescribes the maximum rates which may be charged by the railroads for the carriage to Spokane of freight not affected at coast and terminal points by competition of ocean carriers. Fifth. Said order is null and void, and, as there is no valid or definite order of the interstate commerce commission which can be enforced by a decree of this court, the proceedings should be dismissed. The master, however, considered that the court had, in effect, ruled that the petitioners were entitled to have a full investigation and a decision upon the merits of the controversy, and, as counsel for the petitioners insisted upon going to the merits in this proceeding, he received the evidence, and has made a full report, which presents the facts and his conclusions on all the points at issue.

Although the order of the court referring the case to the master, and the rulings preceding it, may have, in effect, overruled the objections to a hearing upon the merits, still the questions brought to view by the master's report were not argued or considered, nor has the court taken any action which can preclude it from putting an end to this case whenever it shall be ascertained that there is no power in the court to grant the petitioners redress for any supposed wrong set forth in their petition. I regret exceedingly to find, after litigation has been carried on at large expense to the parties, that it must come to nothing, by reason of limitations of jurisdiction in the court. I must, however, concur with the master in the conclusions above given, for the reasons which he has assigned, and for the further reason that, since his report was filed, the supreme court of the United States, in the case of Interstate Commerce Commission v. Cincinnati, N. O. & T. P. R. Co., 167 U. S. 479–511, 17 Sup. Ct. 896, 905, has considered this subject with great deliberation, and given an exhaustive and comprehensive decision, leaving no way open to avoid the conclusion aforesaid. In the opinion of the court in that case, Mr. Justice Brewer says:

Our conclusion, then, is that congress has not conferred upon the commission the legislative power of prescribing rates either maximum or minimum or absolute. As it did not give the express power to the commission, it did not intend to secure the same result indirectly by empowering that tribunal to determine what in reference to the past was reasonable and just, whether as maximum, minimum, or absolute, and then enable it to obtain from the courts a peremptory order that in the future the railroad companies should follow the rates thus determined to have been in the past reasonable and just.

The first part of the order which authorizes the railway companies to make commodity rates on competitive traffic to terminal points less than their rates on like traffic to Spokane, but that such commodity rates must not be lower than necessary to meet competition, nor be applied to articles not actually subject thereto, is a mere statement of what the law authorizes and prescribes, and is, of course, too indefinite to be the basis of a decree to enforce obedience. In so far as the order is definite and specific, it is invalid, because the commission was not authorized to prescribe rates.

I am unable to find ground for assuming jurisdiction to determine the important questions at issue in the fact that, when the proceeding was commenced, the Northern Pacific Railroad was in the custody of receivers appointed by this court. If I should disregard the prayer of the petitioners to have the decision of the interstate commerce commission enforced, and treat the petition merely as an appeal to the court to regulate the conduct of the receivers so far as to require them to deal with the merchants and business men of Spokane on just and equitable terms, my decision, whether favorable to the petitioners or otherwise, would not settle the controversy between the people of Spokane and the railroads. It is a rule for the future which these petitioners are chiefly interested in having established; and, the railroad having been transferred to a new company, a decision now as to the obligations and duties of the receivers in the past would be profitless to them, even if given in their favor. It is my opinion, however, that, in every view of the case, it must be regarded as having been improperly commenced, and that a decree of dismissal is the only decree which the court can render. The receivers were required to respond to a specific accusation made against them by the petitioners, which is that, in the operation of the railroad, they disregarded and violated the decision of the interstate commerce commission. The court is called upon to adjudge whether or not the receivers are guilty as charged, and I hold that in the determination of that question the same rules and principles must be applied which would be applied if the railroad were being operated and managed by the officers and agents of the corporation. The receivers have the same right to question the validity of an order made by the interstate commerce commission that the corporation would have, and an order which is so inherently defective that it cannot be enforced against the corporation which was originally required to obey it cannot be enforced against receivers having temporary custody and control, in place of the corporation's officers and agents. A decree will be entered dismissing the case.